# CHARLESTON.

Bettman *et al v.* Harness *et al.*

Submitted June 24, 1896—Decided Nov. 25, 1896.

1. Equity Jurisdiction — Injunction — Questions Involving Title.
   Equity has jurisdiction, by injunction, to prevent acts of irreparable injury to land, even though there is controversy as to title between the parties, and, having jurisdiction on that ground will go on to give full relief, though in so doing it be necessary to decide between two adverse titles.

2. Oil and Gas—Injunction—Boring for Oil and Gas.
   The unlawful extraction of petroleum oil or gas from land, they being part of the land, is an act of irreparable injury. Equity will enjoin it.

3. Preliminary Injunction—Final Decree.
   A preliminary injunction must not do what can only be done after full hearing by final decree, as by changing the possession of realty, or depriving one in possession of its benefits, in any other respect than as to the wrongful act proper to be enjoined; the proper purpose of such injunction being to preserve the present status until a full hearing on the merits shall be had. An injunction as to so much of it as is excessive is void, and ought to be modified on motion.

4. Oil and Gas Leases—Forfeiture.
   A lease for oil and gas contains the clause, "To have and to hold the said premises unto said party of the second part during and until the full term of two years, and as much longer as oil or gas is found in paying quantities thereon, or the rental paid

55

| | |
|---|---|
| 42 | 433 |
| 43 | 110 |
| 43 | 565 |
| 43 | 575 |
| 43 | 580 |
| 42 | 433 |
| 44 | 670 |
| 45 | 35 |
| 42 | 433 |
| 46 | 22 |
| 42 | 433 |
| d47 | 43 |
| 47 | 92 |
| 47 | 102 |
| 47 | 103 |
| 47 | 189 |
| 47 | 191 |
| 47 | 401 |
| 42 | 433 |
| 48 | 350 |
| 42 | 433 |
| 49 | 236 |
| d49 | 243 |
| i 42 | 433 |
| d 52 | 4 |
| e 52 | 5 |
| 52 | 8 |
| j 52 | 17 |
| 52 | 231 |
| 52 | 643 |
| 42 | 433 |
| 53 | 214 |
| 53 | 216 |
| 53 | 219 |
| j 53 | 222 |
| 53 | 505 |
| 42 | 433 |
| d54 | 486 |
| 42 | 433 |
| 56 | 58 |
| 56 | 414 |
| 56 | 415 |
| 56 | 661 |
| 42 | 433 |
| 59 | 621 |
| c 60 | 405 |
| 42 | 433 |
| 62 | 423 |
| 63 | 23 |
| 63 | 619 |

thereon," and provides for a rent of one-eighth of the oil, and two hundred and fifty dollars per year for gas, and has a clause reading: "Operations shall be commenced and one well completed within one month, and, in case of failure to complete one well within such time, the party of the second part agrees to pay the parties of the first part, for such delay, fifteen dollars per month in advance after said time for completing such well as above specified, and the parties of the first part agree to accept such sum as a full consideration and payment for such delay until one well shall be completed; and a failure to complete one well or to make such payment for such delay is to render this lease null and void at the option of the lessor." The lessee, having failed to begin operations within the two years, has no right to continue the lease by payment of fifteen dollars per month, but the lease is ended.

5. OIL AND GAS LEASES—CONSTRUCTION OF CONTRACTS.
   The words "or" and "and" in a contract will be changed and read as "and" and "or" where it is plain they were so intended.

6. ESTOPPEL *in pais.*
   To bind one by estoppel *in pais* from statement or conduct, he must have stated, or led another to believe in, something as a fact, and that other must be ignorant of the contrary, and must rely on it, and act to his injury differently from what he would have done but for such statement or conduct.

W. P. HUBBARD, H. P. CAMDEN and WEIL & THORP for appellants, cited Bisp. Eq. 31, 429; High, Inj. §§ 698-99, 701, 460, 4, 715, 354, 356; 19 How. 271; 6 Bro. P. C. 575. 131 Pa. 298; 78 Pa. 88; 123 Pa. 250; 7 W. Va. 223; 20 W. Va. 175; 24 W. Va. 698; 26 W. Va. 603; 34 W. Va. 406; 24 S. E. Rep. 596; 24 S. E. Rep. 682; 7 Johns. Ch. (N. Y.) 315; 1 Johns. Ch. (N. Y.) 318; 7 W. Va. 223; 11 W. Va. 464, 673; 1 Beach, Inj. §§ 110-12; 5 Cal. 119; 1 Md. 525; 10 W. Va. 50; 5 Leigh, 192; 52 Fed. Rep. 428; 24 S. E. 645; 17 W. Va. 578, 582; 34 Nebr. 616; 41 Mich. 207; 10 Mich. 335; 25 Mich. 489; 44 Mich. 479; 6 W. Va. 441; 13 Wall. 23-46; 111 U. S. Rep. 341; 95 U. S. 673; 109 U. S. 278, 282; 12 W. Va. 117, 131, 132; 113 Pa. 83; 146 Pa. 185; 133 Pa. 589; 138 Pa. St. 589; 152 Pa. 451; 1 Her. Est. and Res. Jud. pp. 862, 865; 2 Her. Est. and Res. Jud. 833-4; Big. Est. 55-7.

VAN WINKLE & AMBLER and J. G. McCLURE for appellees, cited 10 East, 136; 23 Barb. (N. Y.) 153; 114 Ill. 594; 76 Ind. 452; 37 La. Ann. 155; 112 Pa. 598; 80 Ill. 208; 46 How. (N. Y.) Pr. 210; 10 Abb. Pr. (N. S.) 166; 46 N. Y. 413; 49

Ill. 498; Pom. Eq. Juris. §§ 182; 276, 280, 277 (note); 39 W. Va. 214, 265, 231, 270; 36 W. Va. 546, 639; 20 W. Va. 46; 35 W. Va. 463, 480, 733, 771; 24 W. Va. 602; 22 W. Va. 621; 4 W. Va. 543; 37 W. Va. 623, 323; 31 W. Va. 621; 22 W. Va. 621; 33 W. Va. 738; 1 Johns. Chy. Rep. 168; 2 Am. Dec. 293; 1 Sto. Eq. Jur. § 256; 5 Call, 471, 476; 28 Atl. Rep. 1004; 21 S. E. Rep. 1020; 10 Am. Dec. 38-42; 54 Am. Dec. 159; Code, p. 707; 15 B. Mon. 479; 1 Sawy. (U. S.) 470; 31 Fed. Rep. 100; 45 N. Y. 703; 10 Gratt. (Va.) 386, 398; 7 Ves. 305; 106 Pa. St. 398; 71 Ga. 296; 29 Fed. Rep. 674; 5 Hare, 400; 1 Myl. and K. 154; 2 Coll. 507; 10 Am. & Eng. Enc. Law, 791 (note 3); Kerr, Inj. 232; 15 Ves. 138; 19 S. E. Rep. 423; 4 Ohio, 175; 145 U. S. 459; 24 S. E. Rep. 696, 688; 107 Pa. St. 57; 21 S. E. Rep. 1020; Big. Est. 642, 661, 545; 117 U. S. 96; 136 U. S. 68; 149 U. S. 496; 155 U. S. 655, 673.

BRANNON, JUDGE:

Harness and wife made two leases giving Watson exclusive privilege to drill and operate for petroleum oil and gas on two tracts of land in Pleasants county, which he assigned to Marcus A. and David Bettman, retaining, however, some interest, the three claiming as partners under the name of Bettman & Watson. No possession was taken under these leases, and later Harness and wife, claiming that these leases had expired, made a lease for oil purposes of both tracts to Finnegan, under which possession was taken, and boring of a well for oil was begun, when Bettman & Watson obtained against Finnegan and others an injunction enjoining operations under this second lease; and, the judge having overruled a motion to dissolve this injunction, the defendants to the injunction appealed. Further facts are stated below in connection with the law points to which they relate.

Will equity entertain this suit? Counsel for appellants ably insist that the acts enjoined are but trespass to realty, reparable in damages in a court of law; that no injunction lies; and that, under cover of injunction, it is an effort to try title to land in equity, when the law court is open for adequate remedy by ejectment, both to recover possession

and damages. Clearly, the general rule is that equity will not restrain a mere trespass to land, and, under the guise of so doing, try title to land, by entertaining what may be called an "ejectment bill"; but that rule has been found in later years not to answer fully the needs of men in their changing multifarious wants in the calls of life, and we find exceptions fastened upon the rule, fixed as the rule itself. The last case decided by the great Chancellor Kent, driven from the bench in the meridian of his greatness by the constitution of New York because he had attained the age of 60 years, tells us of this change of the old rigor of the rule. *Jerome* v. *Ross*, 7 Johns. Ch. 315. The rule there stated is that "an injunction is not granted to restrain a mere trespass, where an injury is not irreparable and destructive to the plaintiff's estate, but is susceptible of perfect pecuniary compensation, and for which the party may obtain adequate satisfaction in the ordinary course of law. It must be a strong and peculiar case of trespass, going to the destruction of the inheritance, or where the mischief is remediless, to entitle a party to an injunction." Judge Story, after a review of the cases, says in 2 Eq. Jur. § 928: "If the trespass be fugitive and temporary, and adequate compensation can be obtained in an action at law, there is no ground to justify the interposition of courts of equity. Formerly, indeed, they were extremely reluctant to interfere at all, even in regard to repeated trespasses; but now there is not the slightest hesitation, if the acts done, or threatened to be done, to the property, would be ruinous or irreparable, or would impair the just enjoyment of the property in future. If, indeed, courts of equity did not interfere in cases of this sort, there would be a great failure of justice in the country." In trespass to mines there is greater liberality in allowing injunctions than in ordinary trespass to land, since the injury goes to the destruction of the minerals—the chief value. 1 High, Inj. § 730. These principles have been followed in America in cases too numerous to cite here. For some of them see note to *Jerome* v. *Ross*, 11 Am. Dec. 498, 500; *Indian. River Steamboat Co.* v. *East Coast Transp. Co.* (Fla.) 29 Am. St. Rep. 258, 277, 10 South. 480; *Carney* v. *Hadley* (Fla.) 37 Am. St. Rep. 108, 14 South.

4; note to *Smith* v. *Gardner* (Or.) 53 Am. Rep. 346, 6 Pac. 771. 2 High, Inj. § 697, emphasizes this exception of irremediable injury. Decisions binding us as authority do not oppose, but recognize, this exception. *Anderson* v. *Harvey's Heirs,* 10 Gratt. 386, 398, pointedly recognizes it. There an injunction was sustained against one who, under color of adverse title, was taking out iron ore. In the cases of this state cited by counsel against· jurisdiction in equity for this case [*McMillan* v. *Ferrell,* 7 W. Va. 223; *Cox* v. *Douglass,* 20 W. Va. 175; *Schoonover* v. *Bright,* 24 W. Va. 698; *Cresap* v. *Kemble,* 26 W. Va. 603; *Watson* v. *Ferrell,* 34 W. Va. 406 (12 S. E. 724)] this exception of irreparable damage is definitely admitted. They were cases of mere naked trespasses, and the omission of this averment was mentioned as a want of the bills. *Christian* v. *Vance,* 41 W. Va. 754 (24 S. E. 506) and *Moore* v. *McNutt,* 41 W. Va. 695 (24 S. E. 682) do not bear on this matter, but on the principles of jurisdiction in equity to remove cloud on land title. The jurisdiction for this case is not claimed to rest on the right to remove cloud on title, but on irreparable injury, and that, jurisdiction being warranted on that ground, the court will go on to adjudicate on the rights of parties as it has jurisdiction for one purpose.

It makes no difference, if the elements of irreparable injury be present, whether the party doing it be solvent or insolvent. 1 Beach, Inj. § 35. · Such being the rule, the question—often of difficulty—is one of its practical application. What is irreparable injury? It is impossible to define it inflexibly. Rights of property and its uses change so; so many new rights of property with new uses arise as time goes on. Here is the right to oil and gas a few years ago unknown; the right sometimes in separate ownership. The word "irreparable" means that which can not be repaired, restored, or adequately compensated for in money, or where the compensation can not be safely. measured. The courts have generally regarded as irreparable injuries the digging into mines of coal, iron, lead, and precious metals, and, as such injuries subtract from the very substance of the estate, and tend to its ultimate destruction, equity is said to be prompt to restrain them. Rock, if of

special value, comes under this rule. See *U. S.* v. *Gear*, 3 How. 120, and other cases cited in note to *Jerome* v. *Ross*, 11 Am. Dec. 501; note to *Smith* v. *Gardner* (Or.) 53 Am. Rep. 347 (6 Pac. 771); 1 Beach, Inj. § 35; 1 High, Inj. § 730. We know but little of petroleum oil and gas hidden far in the bowels of the earth, but from that little we can say they are of great value, and are exhaustible, and when exhausted in a locality, can not be restored by the art of man, and perhaps never even by the mysterious alchemy of nature. Surely, they fall under the rule which considers the subtraction of precious things from under the soil as working irreparable injury, as much as iron ore in *Anderson* v. *Harvey's Heirs*, 10 Gratt. 386, to which I refer as decisive and binding under this branch of this case. We know that these substances are the sole property and value of the plaintiffs' estate under their lease—the only object of the lease. In *Williamson* v. *Jones*, 39 W. Va. 231 (19 S. E. 436) we decided that petroleum oil in place is a part of the realty, and its unlawful removal a disherison which equity will enjoin.

The law affords no adequate remedy so as to deprive the party of injunction. An injury to realty may be incapable of compensation in money for several reasons: (1) It may be destructive of the very substance of the estate; (2) it may not be capable of estimation in terms of money; (3) it may be so continuous and permanent that there is no instant of time when it can be said to be complete, so that its extent may be computed; (4) it may be vexatiously persisted in, in spite of repeated verdicts. In this case, when must the party sue? When all the oil is drained out, and the other party is insolvent? Or must he have suit after suit through years? At what time can we estimate the entire damage? How, with justice to either party? To deprive a party of his injunction to keep his own oil in his own soil, it is not enough to say that he has some remedy at law, but it must be adequate and commensurate with his whole right in the particular case. *Jerome* v. *Ross*, 11 Am. Dec. 501; *Osborn* v. *Bank*, 9 Wheat. 738; 1 High, Inj. § 30. To avoid multiplicity of suits, injunction may lie, because that shows inadequacy of legal remedy. *Walling* v. *Miller*,

108 N. Y. 173 (15 N. E. 65); 1 High, Inj. § 702; *Lewis* v. *Town of North Kingstown* (R. I.) 27 Am. St. Rep. 727 (11 Atl. 173). Where repeated acts are done, the entire wrong may be prevented by injunction, though each act itself may not be destructive to the inheritance, and not irreparable, and the legal remedy adequate, if that act stood single and alone. 1 Beach, Inj. § 35. What title is there to maintain such an injunction? Will it lie when it is disputed, to thus try the title in equity? The syllabus in *Cresap* v. *Kemble*, 26 W. Va. 603, says it must be established by legal adjudication, or undisputed. So it is often stated in the books. Does it mean already tried at law? I suppose not. The opinion in this case does not say so, but says it is sufficient if the bill clearly aver good title. Such I think is the law. Here there is a wilderness of decisions, variant and indefinite, arising from the difficulty encountered by the courts in the effort to at once recognize the rule that equity will not try land title and deprive a party in possession of its benefits, and, on the other hand, the rule that irreparable injury will be stayed by injunction. Take the case where irreparable injury is being done to land claimed under two hostile titles. One party files a bill of injunction showing on its face a clear title, and the other answers, showing clear title *prima facie*. Will you at once dissolve the injunction, and send the party to try his title at law, from the fact that there are adverse claims, when in fact the plaintiff ultimately shows, or could show, the better title? Much law can be found to answer "yes." I think the true answer to that question is "No." Where there is irreparable damage, injunction lies, though there be conflicting title. *Erhardt* v. *Boaro*, 113 U. S. 537 (5 Sup. Ct. 565); *Iron Co.* v. *Reymert*, 45 N. Y. 703; note to *Jerome* v. *Ross*, 11 Am. Dec. 506; 1 High, Inj. § 69; 2 Beach, Inj. § 1140. *Anderson* v. *Harvey's Heirs*, 10 Gratt. 386, was a case of adverse title. Equity jurisdiction, from its flexibility and facility in practice in administering justice, had been for centuries ever expanding its scope. So here. Since writing to this point I notice section 367 of the late work of Spelling on Extraordinary Relief, which, from my examination of the subject, fairly states the law of our days on this knotty subject: "Former-

ly great importance was attached to the fact that a defendant whom it was sought to restrain from committing trespass in good faith set up a claim to the land; and a few courts still attach undue importance to a dispute concerning the title, apparently losing sight of the departure from the early practice in this respect. It is true now, as it ever has been, that an injunction will not be granted where the title of the plaintiff is in dispute previous to the determination of the legal rights of the parties, unless the threatened act is of such a nature that, should the right to commit it be decided against him, the consequence would be irreparable. The prevailing view and practice of the present day may be thus stated: (1) Where the bill states facts which show that a threatened trespass, if not prevented, will result in irreparable damage, or is in character and tendency destructive to the inheritance or to that which gives its chief value, an injunctien will be granted, notwithstanding a dispute, or even pending litigation, as to title. (2) Where an action has been already commenced to try title, the injunction will only be temporary, to be dissolved or made perpetual, according to the results of the action. (3) Where no action has been begun, injunction will be granted and continue to give the defendant an opportunity to bring an action, which being prosecuted to judgment against the complainant in possession will entitle him to a dissolution of the injunction; but, if the action at law has no opposite result, the injunction will be perpetuated. (4) The rule applies, and the same course is taken, when the grounds upon which the relief is sought and granted is the prevention of a multiplicity of suits. Hence the only influence which a dispute as to title can have, in case of irreparable injury sufficiently alleged, is in the character of relief granted —whether absolute, or conditional and temporary; and that is of no decisive importance on the question of whether any relief whatever shall be granted." And equity, having once taken jurisdiction, will go on to do complete justice, though in so doing it have to try title, and administer remedies which properly pertain to courts of law. Note in *Lewis* v. *Town of North Kingstown* (R. I.) 27 Am. St. Rep. 727 (11 Atl. 173); *Yates* v. *Stuart's Adm'r*, 39 W. Va. 124

(19 S. E. 423). Such a bill must not only allege irreparable injury, but state facts making a case of irreparable injury. *Watson* v. *Ferrell*, 34 W. Va. 406 (12 S. E. 724). The bill alleges that the defendants are about to bore for and take oil from the premises—facts which *per se* constitute irreparable injury.

Another subject. Appellants contend that the injunction awarded is erroneous—in fact void—because too broad. The sole object of an interlocutory or preliminary injunction is to preserve the subject in controversy in its then condition, and, without determining any question of right, merely to prevent the perpetration of wrong, or the doing of any act whereby the right in controversy may be materially injured or endangered. It can not be used for the purpose of taking property out of the possession of one party, and giving its possession to another; nor does it compel the defendant to undo what he has done, as this might injure him as much as his act would injure his opponent. Injunction prevents the further continuance of injurious acts begun, or prevents doing them, if only threatened. It acts only prospectively to preserve things in *statu quo* until ultimate decision. It does not prejudge without hearing; it does not anticitate ultimate decision, giving decision on the merits, and then hearing. High, Inj. §§ 4, 5, 355, 715. On an application to grant or to dissolve a preliminary injunction, the court will not decide questions of title, but will defer this till a hearing on the merits; nor will it change possession. "Where the defendant is engaged in removing from the complainant's estate that which constitutes its chief value—for instance, lumber —the case is one peculiarly within the province of a court of equity to stop the mischief through its preventive writ. And if a preliminary order restrains one of the parties from interference with the property in dispute, and leaves the other free so to interfere, the court will modify the order so as to do equal justice to the parties, and keep the property in *statu quo* until the determination of the controversy as to title and their respective rights." "If it undertakes, or if its effect is, to dispose of the merits of the controversy without a hearing, or if it divests a party of his possession

or rights without a trial, it is void." 1 Beach, Inj. §§ 110, 112. Possession is *prima facie* evidence of rightful title, because it is one of the elements of title, is sacred, and no court can in any form of proceeding take it from a man without a hearing, without overthrowing the maxim that no man shall be condemned in person or deprived of property without a day in court and due process. Try the present case under these rules.

The order of injunction, a purely preliminary one, did virtually what a final one on final decree would have done, save that a final decree would have delivered possession expressly, while this does so virtually; for it not only enjoins the defendants from boring for oil, but from "in any manner interfering with the rights of the plaintiffs under the leases" under which they claimed, "and from interfering with the plaintiffs' use of said land and from setting up any claim against the rights of the plaintiffs under said leases," and enjoin the defendants "from setting up any claim under the pretended leases" under which the defendants claimed. Under this wide injunction, how could defendants even continue in possession when it told them not even to claim under their lease? If the plaintiffs entered on the premises to bore just where the defendants were boring, how could the defendants lift a finger in resistance, or fail to yield the very spot where they were boring, if the plaintiffs put their derrick there? Later, the defendants asked the court to modify the injunction, but it refused to do so. If, on full hearing, this order had been found to be properly anticipatory of the eventual real rights, it would be then a dead issue, and I thought that the later hearing to dissolve might be such a hearing; but though it was on bill, answers, and other papers, and is practically, no doubt, as full a hearing as would ever take place, yet it was on *ex parte* affidavits, not on depositions where cross-examination was allowed, and hence it is not such a hearing. The preliminary injunction was erroneous, and the refusal to modify was error to the prejudice of appellants, and, if we did not decide the question on the merits for the plaintiffs, we would modify the injunction. *Boyd* v. *Woolwine*, 40 W. Va. 282 (21 S. E. 1020) allowing a mandatory injunction, is

cited to justify this. That was to preserve the *status quo*
by requiring defendant to unlock gates on a private way.
The court did not decide that this was or was not right *ab
initio*, but, finding it right in the end upheld it. It is ar-
gued that this injunction may be justified by the fact that
the defendants were boring on adjacent lands, and thus
draining oil from this land. Is it meant that this injunc-
tion could stop boring on adjacent land, or stop draining
through a well on adjacent land of oil from this land? How
do we know there is oil on this land? Shall we stop boring
on the adjacent land without this knowledge? We could
not stop it with certain knowledge of the fact, because oil
is fugitive, and when it passes from one man's land, and
comes to the surface through a well on another's land, it
belongs to him on whose land it reaches the surface, even
if we know it came from the other land.

Another subject. I come now to the merits—the rights
of the plaintiffs under their leases. No work for develop-
ment of oil or gas was done under them within the two
years fixed by them as the term, but through that term, and
for thirteen months after its close, the lessees paid the
sums of fifteen dollars and five dollars per month required
by them for delay of work of development, and the lessors
received that money up to the close of that thirteen months,
when they refused to receive any more, and the lessees de-
posited it thereafter in bank. Did such payments continue
the leases under their letter after the two years? That de-
pends on their construction. The lessees say they had the
right to bore or not, as they chose; that, if they did not bore,
all they had to do was to pay said monthly sums, and their
two leases were kept in full force, not merely within the
two years, but thereafter until they should cease to pay.
Take the *habendum* clause reading, "To have and to hold
the said premises for said purposes only * * * during
and until the full term of two years next ensuing the date
above written, and as much longer as oil or gas is found in
paying quantities thereon, or the rental paid thereon." What
do the words "or the rental paid thereon" mean? For they
are words which, it is thought, prolong the term over two
years, the claim being that either the production of oil or

payment of the fixed sums, either one or the other, extended the term. Here bring in another part of these leases: "Operations on the above-described premises shall be commenced and one well shall be completed within one month, unavoidable accidents and delays excepted; and, in case of failure to complete one well within such time, the party of the second part agrees to pay to the parties of the first part, for such delay, the sum of fifteen dollars per month in advance after the said time for completing such well as above specified, and the parties of the first part hereby agree to accept such sum as a full consideration and payment for such delay until one well shall be completed; and a failure to complete one well, or to make such payments for said delay, is to render this lease null and void at the option of the lessor. A deposit to the credit of the parties of the first part in Parkersburg National Bank, Parkersburg, W. Va. is to be a good payment of any moneys due under this contract."

Again I ask, what do the words "or the rental paid thereon" mean? Does the word "rental" mean the fixed sum of fifteen dollars? If not, there is no extension from its payment. Now, the clause providing for payment of the fifteen dollars does not call it rental, as might be expected if so considered, but says it is for delay in completing a well. It says a well shall be completed in a month, and, on failure to do so within a month, the lessee is to pay fifteen dollars per month after that month, and the lessor to accept it as full pay for such delay until a well should be completed; that is, provided it be within two years, since on this clause alone we would say it contemplates completion within the term of the lease. "For such delay." What delay? The delay just then spoken of. So that we can not say that the word "rental" in the first clause gets its meaning from the second clause. And the monthly payment is not, in nature, rent or rental, unless plainly given that meaning. We can use words in other than their first or usual sense, but it must clearly appear that such is the purpose. This money has been sometimes called "commutation money." Call it what you may, but you can not make rent out of it in the first instance. But taking the two clauses together, does it, where

used in the first clause, point to this money payable in lieu of boring? It must be given some meaning, and what else can it mean? what else is in the lease for it to mean? you may ask. I see nothing else to refer it to except the one-eighth share of oil and the two hundred and fifty dollars per year for gas as rent provided by the lease, should they be found in paying quantity. But you will say this can not be, because the lease says the term shall be two years, and "as much longer as oil or gas is found in paying quantities or the rental paid thereon," and this clause presupposes insufficient oil and gas; and how can a fraction of the oil be then paid, or the rent for the gas either? And it certainly provides something to extend the term on failure of oil and gas. It provides an extension of the term in either one or the other of two ways—either by finding oil in paying quantity, or, if that do not happen, then by payment of rental; for it uses the word "or" notice; and hence you will say, there is nothing else in the contract to refer the word "rental" to but these monthly payments. I think that the real intention was to say that the lease should continue two years, and as much longer as gas or oil in paying quantity be found, and the rent for that gas and oil be paid. We want to get at what was the most likely meaning of the words used. Courts may look to language, the subject-matter, and surrounding circumstances to get at the meaning, and thus place themselves in the situation the parties were in, to glean their probable purpose. Point 19, *Crislip* v. *Cain,* 19 W. Va. 438; *Caperton's Adm'r* v. *Caperton's Heirs,* 36 W. Va. 479 (15 S. E. 257); *Nash* v. *Towne,* 5 Wall. 689. Here are a landowner and an oil producer negotiating a lease. A term of only two years is fixed; but plainly that is only the period for completing a well. If a good one is obtained, the operator wants longer time, and he inserts a clause extending the term as long as oil or gas is produced in paying quantities; but the lessor wants the lease continued only upon condition that his share of oil and gas rent be paid, and he means to have a clause which provides a continuance of the lease as long as both oil is produced and his rent paid. It is unreasonable to suppose he would continue the lease, and omit a guaranty of his rent; that he would

agree to continue without a guaranty of prompt payment. Here is a clause annexed to the clause continuing the lease which will insure the rent, if we give the word "or" the meaning of "and." Words must serve intention in the construction of contracts. Story, Cont. §§ 773, 774. These words "or" and "and" are so often used inexactly that the one will be read as if the other had been used, to serve the plain intent. It is done in the construction of wills (Schouler, Wills. § 477) and in the construction of statutes (Suth. St. Const. § 252); and if the word of a wise legislative assembly must yield to intention, why not the word of two men not so learned and exact? The intention is the question in all these cases. Bish. Cont. § 383, says it can be done in the construction of contracts. Likewise, 2 Pars. Cont. 497. Just now I notice the case of *Petty* v. *Fogle*, 16 W. Va. 497, holding this to be law in this state in construing contracts. And note that clause providing that a failure to complete a well or make payment for delay shall forfeit the lease. Does not this mean that failure to make payments within that two years shall forfeit. It does not mean that failure to make payments after that shall forfeit the lease as they would not likely provide a forfeiture for nonpayment after expiration of that term, as none was needed. This goes to show that these payments are not rentals, but compensation only for delay within the two years.

This much I have said upon the letter of the lease; but as we are placing ourselves in the situation of the parties and viewing the subject-matter on which they were treating, and seeking their probable aim, how hard upon the landholder it would be, how improbable, to say that when he has, by express words, shown a fixed purpose to set two years as the limit within which a well must be completed, he would turn right around, and give his caution all away, by agreeing to an indefinite postponement of development on what would be a mere pittance compared with what he would realize if producing wells were bored—the very object for which he makes a lease; certainly the controlling object. And all the while that same lessee, with wells on an adjoining lease, is draining all the oil away from this landholder and paying the pittance. This would work for

the owner a very unfortunate result, which was furthest from his intention. He relied on development, because the lessee bound himself to develop by the lease. That was the motive on his part. If he had been warned of this result, he would never have leased. This construction is not harsh on the oil producer. He has had the term he fixed. The other construction would cover the whole country with cloud and incumbrance over titles for many years, preventing the use and transfer of property, the development of the country, and promoting and furthering monopoly; for we know, and may lawfully know, as all men know, that vast areas are held by companies or organizations holding these leases for future use. I shall not say that this construction is one about which men may not fairly differ. But suppose we were in doubt; should we not give that construction which would avoid the evils above referred to? This Court said in *Miller* v. *Insurance Co.*, 12 W. Va. 116, that in construing an instrument prepared by an insurer it ought to be read most strongly against the maker, especially where the terms or language are doubtful or ambiguous, because prepared by the agent of the company or by the company. In *Insurance Co.* v. *Wilkinson*, 13 Wall. 222, Justice Miller said on an insurance policy that it could not be denied, logically considered, that the application is the work of the assured, and if left to himself, or to such assistance as he might select, such persons would be his agent, and he alone responsible, but it was so well known that no court would be justified in shutting its eyes to it, that insurance companies send agents all over the land soliciting applications, and parties taking policies look to such agents, and rely on them. And in *Moulor* v. *Insurance Co.*, 111 U. S. 335 (4 Sup. Ct. 466) Justice Harlan said, in effect, that when a policy contains contradictory provisions, or has been framed so as to leave room for constructions rendering certain things doubtful, the courts should lean against the construction imposing a warranty on the assured; that the company's attorneys, officers, and agents prepared the policy, and the language which the court must interpret is its language, and it is both reasonable and just that its own words should be construed most strongly against it. We

would be blind to patent facts—that those engaged in the production of oil send agents armed with printed leases to solicit leases, and they take leases for great areas, and they are forms already prepared, and the people in many instances know little of them, are inexperienced in oil operations, and are without legal advice. They rely on the agent. These leases were prepared by such an agent taking leases for a large area. Harness and wife swear that they asked that the words "or the rental paid thereon" be stricken out, but the agent assured them it was unnecessary, because the leases with these words in could not run longer than two years unless in that time oil was gotten, and, relying on this assurance, they signed. True, the law says one signing a writing must know the law of it; but I use the arguments to show that, if there were doubt, it ought not to be construed most strongly against the lessors—a rule having little or no force in case of indentures, or in any case (2 Pars. Cont. 507)—but against him who solicited and prepared the lease. We are supported in our construction of this lease by a decision of the supreme court of Pennsylvania upon a lease almost exactly like this, containing the *habendum* clause, "To have and to hold the said premises for the term of two years from the date hereof, and as much longer as oil or gas is found in paying quantities, or the rental paid thereon." It provided that the lessee should commence a well within thirty days, and complete within that time, "or, in default thereof, pay to the party of the first part for further delay an annual rental of sixty dollars, payable quarterly in advance, from the time for completing a well until such well shall be completed." It will be noted that this lease is stronger than the one we have in hand in favor of lessee, because it in terms calls the money payable in default of boring "rental." The court held the term to end at the close of two years, and that the lessee could not, in the absence of boring, prolong it by paying the sixty dollars annually. *Gas Co.* v. *George,* 16 Pa. St. 47 (28 Atl. 1004). That is point-blank authority against the appellees in the construction of the lease in this case.

It is but fair to notice an argument to the effect that the

Harnesses received the commutation money for thirteen months after the two years, and that, where the construction of an instrument is doubtful, the acts of parties under it afford good ground to give it that interpretation indicated by such acts. It is true, as laid down in *Caperton's Adm'r* v. *Caperton's Heirs*, 36 W. Va. 479 (15 S. E. 257) that such acts of the parties who made an instrument, and knew its purpose, are a forceful clue to get at the meaning. But such acts lose force when done under protest, or with express declaration that the contract means another thing, as in this case; for, a few days after the end of the two-year term of the leases, Mrs. Harness wrote Bettman & Watson, asking them to return her lease, as the same had expired by limitation, and she and her husband desired to have the same returned and canceled. Early compliance was asked. Very plain was this of her and her husband's interpretation of the lease. On the same date of Mrs. Harness' letter to them, Bettman & Watson wrote Mr. Harness a letter, inclosing one for his wife, containing statement of rentals paid, with receipts to be signed therefor by them, telling them their money was in bank, expressing surprise that they had refused to receive "the letters." It seems from this they had sent letters or receipts before, which had been refused. To this letter she very promptly replied that she was anxious to have an interview at their earliest possible convenience, as she and Mr. Harness wanted a more definite understanding. Bettman & Watson replied that they did not know what she meant by wanting a more definite understanding, that the leases constituted that, insisting that under their provisions they had paid the monthly sums, and that they had the right thus to extend the leases, that they intended to retain their leases until operations in the vicinity, "or possibly on your farms," should prove there was no oil, thus, while insisting on their construction of the leases, inspiring a hope in the breasts of Harness and his wife that they would likely soon bore on these lands. In affidavits, Harness and wife say they told Watson at the end of the two years that the leases were out; that they had importuned Watson often during that term to go on to work; that, in an interview after

the two years, Watson claimed that the leases were yet in force, and, she denying it, and claiming that he ought to surrender the leases, he made excuses for not boring in the two years, and asked that a little more time be given, promising to go ahead with work, and she and her husband, relying on his promise, agreed to accept monthly payments for a while longer, with the understanding that, if they would proceed during any month for which advance payment was made, their rights under the lease would be continued as long as oil or gas should be found; that this went on for a third year, and, no work being done, she and her husband declined to receive further payments; that, later, Watson asked them what they would take for new leases, and a sum was named, but he did not agree to it, but said he was going to New York, and would consult the firm, and asked what was the least they would take, and she said she would make liberal reduction from that sum, as they had once leased their land; that, Watson not returning by the time fixed, they concluded he had abandoned all thought of making new leases, and had abandoned all claim under the old, and she and her husband made the lease to Finnegan.    Under these facts we are bound to say that Harness and wife did not construe the leases as calling for an extension by payment of monthly sums, and their acts in receiving them do not show that they so construed the leases.

Another subject.    Much as I have said, in deference to the elaborate argument of counsel, and in view of the practical importance of the case, another point is to be settled, which is urged with zeal by counsel for appellees; that is, the doctrine of equitable estoppel.    They claim that as the lessors accepted, for thirteen months after the two years, the payment of the sums of fifteen dollars and five dollars each month, the plaintiffs are barred of relief.    What effect can such payments work?    We have concluded that those payments did not prolong the leases, and thus they are gone.    Such payments can not create a new estate, unless it be a tenancy from year to year.    If they create any other estate, what?    Is it a term of years? If so, how long?    No term was fixed, but was negatived.    A letting for a term must fix the term to be a lease for a specific term.    Tayl.

Landl. & Ten. § 75. It could not be a term of two years, because that required a writing. But is it a tenancy from year to year? Where there is an intent to create a tenancy, and no term is fixed, it is a tenancy from year to year, generally, but there must be such intent. In this case, if we believe Harness and wife, as opposed to Watson, we have to say that it was only agreed that the lessees were to have a few months longer, to go on to develop, but conditional upon that, with power in the landowners, certainly after a reasonable time, to close this state of things. There was no intent to create a new tenancy of any kind. It was merely a tenancy at suffrance of Harness and wife. Tayl. Landl. & Ten. §§ 54, 59.

Estoppel. Appellees' counsel relies with earnestness, apparently with more confidence than on the terms of the contract, on the doctrine of equitable estoppel arising from the acceptance by the lessors of monthly payments after the expiration of the two-years term. They say equity will not permit the lessors to receive this money, knowing that Bettman & Watson claimed that their lease would extend over two years so long as monthly payments were made, thus acquiescing in such construction of the leases, and inspiring them with the belief that such was the construction and consent of the lessors. That might be true, if the facts just above given did not show that Harness and wife had repudiated that construction, and Bettman & Watson knew they had, and only received that money under protest against that construction, and that, denying that construction, they would only allow a few months payments as a grace, on the condition that drilling be done. We are quoted Bigelow, Estop. § 642: "A party can not occupy an inconsistent position, and, where one has an election between several inconsistent courses, he will be confined to that which he adopts." But suppose he adopts one construction, lets the other party know it, and only does what is alleged as an act of estoppel with a specific understanding known to both. It is of the essence of estoppel by conduct, where one alleges that the conduct of another has misled and betrayed him, that the former should be inspiring false belief and confidence in that other; and it can not apply

where that other's eyes are open to the true state of things, and he knows the truth about the thing as to which he alleges he was misled, and knows the other man did not intend to inspire false confidence. Point 5, *Bates* v. *Swiger*. 40 W. Va. 420 (21 S. E. 874); *Mason* v. *Bridge Co.* 28 W. Va. 639, 649; *Graham* v. *Thompson* (Ark.) 18 S. W. 58; Bigelow, Estop. 626. Harness and wife give affidavits that they told Watson, from first to last, that the leases were out, and his claim of right to extend not tenable. Two swear so against one. That Harness and wife did so is probable, because we know they so claimed, from letters of both sides, which letters can not swerve from truth, and it is not likely the Harnesses yielded this point afterwards, when they say, and we can not help but know, that their great object was to have the oil developed on their land. How very improbable that they would dispense with boring for perhaps many years, and thereby lose perhaps great wealth for a merely paltry amount. Harness and wife stated no fact falsely, and to make an estoppel there must be a false statement of facts, not of law. *Mason* v. *Bridge Co.* 28 W. Va. 639. One side knows the facts as well as the other, and both sides were bound to know the law of the lease. We can not say there is an estoppel unless we give it the phase of a promise by Harness and wife that they would abide by Watson's construction; and that is disproven. They told him just the reverse. To constitute an estoppel, the party claiming it must have acted upon the statement or conduct of the other differently from what would have been his course without such statement or conduct. What was the conduct of the Harnesses here? No statement, no false representation; only taking the money. Bigelow, Estop. 630. They took that, not of their motion, but at Watson's importuning solicitation, as a favor to him to give a few months longer for drilling. If they had not received it, Watson would have paid in bank, as he did when Harnesses refused to receive further. So, their action did not induce this payment, but Watson risked that. The Harnesses did nothing unjust or unconscionable, for which equity should visit them with the penalty of giving any one leave to defer development for years on payment of a small sum, de-

feating their object in making the leases, and allowing the lessees, by their wells on adjacent land to drain off all the oil from this land. What wrong have the Harnesses done? "Equitable estoppels only arise when the conduct of the party estopped is fraudulent in purpose or unjust in result. * * * The fundamental principle upon which this doctrine is based is the equitable one—the suppression of fraud and the enforcement of fair dealing." Herm. Estop. §§ 862, 865. Where was any bad intent in the Harnesses in taking this money? Watson paid with eyes open. Id. 833. Where is any injustice, or even hardship, on Bettman & Watson? They say they have paid large sums in these monthly payments. They were only those nominated in the bond, so far as the two years term is concerned; and beyond that only the same amount per month, and received as a favor and grace to them. They omitted, for reasons known to them, to use the leases by development. Any hardship on them is self-imposed. I must not omit to show a marked distinction between this case and *Hukill* v. *Myers*, 36 W. Va. 639 (15 S. E. 151) cited as binding us to recognize an equitable estoppel in this case. That is no authority in this case. In that case was a lease for twenty years, with duty of boring within a year or paying monthly sums, and, both failing, calling for a forfeiture. We held that receiving money after it was due was evidence of intent not to exact, but to waive, a forfeiture. It was a question whether there was a forfeiture, the term not being ended. Here it is not at all a question of forfeiture, but a question whether the lease is by its term ended.

So, we hold that there is no ground to raise an equitable estoppel. This renders it needless to discusss the question, if there were such estoppel as between the parties, whether its effect would be to continue the leases, which were recorded, and known to Finnegan, or whether it would create a new estate, and as such be void as to Finnegan as a purchaser for value without notice, and whether he was such purchaser.

We reverse the order overruling the motion to dissolve the injunction, and dissolve the injunction, and, as the bill is purely an injunction bill, we dismiss it.