**FOX v. KRUG et al.**

**Civ. A. No. 399–W.**

District Court, N. D. West Virginia.

March 8, 1947.

Kermit R. Mason, of Morgantown, W. Va., for plaintiff.

Joe V. Gibson, U. S. Atty., of Kingwood, W. Va., Howard Caplan, Asst. U. S. Atty., of Clarksburg, W. Va., and J. Francis Hayden, Sp. Asst. to Atty. Gen., for defendants.

BAKER, District Judge.

The facts in this case, as they have been developed, will be stated first since the

legal problems involved are more readily understandable after the facts are known.

Ralph A. Fox, a resident of Monongalia County, West Virginia, started in the coal business in the year 1939. The operation at that time consisted of a small mine, known as Fox No. 1. At this time Fox was occupying some property near the City of Morgantown, West Virginia, which included a worked-out coal mine. Fox, with the assistance of his wife and usually one additional employee, began producing coal by removing the pillars from this old mine No. 1. The condition of his financing is shown by the fact that his original capital consisted of nine pigs, two of which he traded for a pony, and one of which he traded for a mine car. He gradually developed this coal business and later moved to a slightly larger operation known as Fox No. 2.

In November of 1944, Margaret L. Fox, a sister of Ralph Fox, started the operation known as Fox No. 3. This Fox Mine No. 3 actually got into production in the summer of 1945. In November of 1945, Margaret L. Fox entered into a contract with the United Mine Workers of America. This contract was actually signed by Ralph A. Fox, as attorney-in-fact for Margaret L. Fox. As of March 31, 1946, Ralph A. Fox purchased the interest of his sister, Margaret L. Fox, in Fox Mine No. 3.

This mine consists of seven acres of surface land, upon which is located a scale house, a dwelling house which was a converted stable, the upper half of which Ralph A. Fox used as his residence, and two shacks which were available for tenancy by men working at the mine. In addition to this surface, the sister had a lease giving her the right to mine 100 acres of Pittsburgh Coal, paying a royalty therefor of 25 cents per ton. This lease she assigned to Ralph A. Fox. The mine is approximately seven miles from the nearest railroad, so that all coal produced must be moved by truck, deliveries being made partly to local consumers and partly to one of three different railroad sidings for shipment by rail.

The type and extent of operations of this mine is best illustrated by a table introduced in evidence as Plaintiff's Exhibit No. 17, which reads as follows:

"FOX COAL COMPANY
COAL MINED
1946

| 1946 | DAYS WORKED | MEN | TONS* | REMARKS |
|------|-------------|-----|-------|---------|
| Jan. | 22 | 17 | 2,406 | |
| Feb. | 24 | 15 | 3,136 | |
| Mar. | 25 | 29 | 7,334 | Two shifts. |
| Apr. | 26 | 5 | 0 | U.M.W.A. Strike |
| May | 24 | 7 | 200 | Average to May 21, 2,588 tons |
| June | 26 | 21 | 4,387 | |
| July | 27 | 15 | 295 | Heading Completed |
| Aug. | 26 | 15 | 3,937 | August 25 Average attained |
| Sept. | 22 | 17 | 6,742 | |
| Oct. | 26 | 20 | 5,058 | |
| Nov. | 15 | 3 | 147 | |
| Dec. | 27 | 12 | 3,685 | |
| Totals | 290 | 176 | 37,327 | |
| ÷ 12 | 24 | 15 | 3,110 | — Average |

* Mine cars held 2 tons until June 1, 1946
    "     "     " 2½ " after June 1, 1946"

From this Exhibit it may be seen that during the calendar year 1946, the mine worked an average of twenty-four days per month, employed an average of fifteen men per month, and produced an average of 3,110 tons of coal per month.

Beginning April 1, 1946, there was a general coal strike in the entire bituminous field. The effect nationally of this strike is too well known to need comment here, and the effect upon the operations at Fox Mine No. 3 is made plain by the above Plaintiff's Exhibit No. 17, which shows that no coal was produced for the entire month of April, and only 200 tons for the entire month of May.

Upon May 21, 1946, the Honorable Harry S. Truman, President of the United States, issued Executive Order No. 9728, setting forth that upon that date there were threatened interruptions in the operations of mines producing bituminous coal, caused by existing or threatened strikes and other labor disturbances; that coal was necessary for the war effort and to preserve the national economy during the transition from war to peace; and authorizing and directing the Secretary of the Interior to take possession of any and all mines to the extent that he deemed it necessary in the interest of the war effort. This Executive Order provided that possession of any mine or mines taken under the same should be terminated by the Secretary of the Interior as soon as practicable but in no event more than 60 days after the restoration of the productive efficiency of any such mine or mines prevailing prior to the taking of possession thereof.

Pursuant to this Executive Order, the Secretary of the Interior took possession of most of the bituminous coal mines in the United States, but did not take possession of Fox Mine No. 3. It will be noted, however, from Plaintiff's Exhibit No. 17, heretofore referred to, that the production at the Fox Mine No. 3 immediately returned to its former level. The production for the month of June, 1946, was actually 1200 tons over the average monthly production for the year.

Upon August 1, 1946, there was a work stoppage at the mine which grew out of a dispute between the miners and Fox as to the capacity of the mine cars being used. The miners, as is customary in that field, were paid on a basis of tonnage loaded. The mine had no facilities for weighing each individual car as it came out of the mine, but the miners' pay was computed upon the assumption that the cars in use held a certain specified tonnage when full. Up to June 1, 1946, it was agreed by all parties that the cars then in use held two tons of coal each. On June 1, 1946, Fox purchased a new lot of mine cars and it was estimated that these new cars held 2½ tons each. The miners conceived the idea that these new cars actually held about three tons, and the resulting argument over this difference of opinion culminated in a walkout on August 1. A few days after the August 1 walk-out, the matter was settled by actually weighing five sample cars, representatives of the miners and the company both participating in determining the actual weight per load thereof. This matter having been settled, the miners returned to work and production was resumed. As shown in Plaintiff's Exhibit No. 17, the total production for August was about 800 tons over the average monthly production for the year 1946.

In the meantime, on or about June 1st, a representative of the Coal Mines Administration came to the mine and told Fox that his mine had been seized by the Secretary of the Interior and posted a notice to that effect. In the latter part of July, this same man appeared again and stated that he had been in error, and that the mine had not been seized and took down the notice he had previously caused to be posted.

On August 2, 1946, the Secretary of the Interior issued his Order No. 2200-B, taking possession, effective August 5, 1946, of some 70 coal mines which had not been seized on May 21st. Included among these mines was Fox Coal Company Mine No. 3. On August 3, 1946, the Coal Mines Administrator designated the plaintiff as operating manager for the United States for said mine, and a notice of seizure was again posted at the mine. Representatives of the Coal Mines Administration called upon the plaintiff, Fox, from time to time, and talked to him concerning his powers and obligations as operating manager for the United

States. Mr. Fox never agreed to act as operating manager for the United States, and from the beginning of the negotiations contended that he did not have a contract with the United Mine Workers of America, and would not be bound by the so-called Krug-Lewis Agreement.

On August 29, 1946, Ralph A. Fox sent a telegram to Admiral Ben Moreel, Navy Coal Mines Administration, Washington, D. C., stating in part: "I wish to be relieved of my duties as operating manager of this mine." According to the testimony, the actual wording of this telegram was dictated by a representative of the Coal Mines Administration.

The mine continued to be operated by Fox. It had its highest monthly production for a month in which only one shift was operated in September, and a very high production in October. In November there was a drop in production caused again by the fact that all the mines in the country went on strike during that month, but in December, 1946, the mine returned to its high production, producing in that month 575 tons more than its average monthly production for the year.

In the meantime Fox had discharged four of his former employees; namely, Frank Skidmore, August Schleger, Fred Schleger, and Raymond Mayfield. These men had been discharged by Fox because of unsatisfactory work records. All of these men were members of the United Mine Workers of America. In fact, approximately 70% of all of Fox' employees were union men in good standing. Frank Skidmore had sought the assistance of his union to force Fox to re-employ him and the union had sent a so-called umpire, who went to the mine and conducted a so-called hearing in the absence of Fox, and then attempted to make an order requiring Skidmore's re-employment. This order Fox refused to obey. All of this had been in early October, 1946. As soon as Fox refused to re-employ these discharged miners, the President of the miners' union, from Fairmont, and certain United States Navy Personnel, who represented the Coal Mines Administration in this field, began a campaign to compel Fox to rehire these men and give them jobs in the place of other employees who were doing satisfactory work. At one point in the negotiations, the Union President stated that if necessary he would spend $50,000 to break Fox.

In December, 1946, the President of the United States issued a Proclamation, No. 2714, 50 U.S.C.A.Appendix, § 601 note that hostilities would cease as of December 31, 1946.

On January 6, 1947, an attorney, who was and is a civilian employee of the United States Navy, but acting for the Department of the Interior and Coal Mines Administration, three officers of the United States Navy in military uniforms, and two members of the West Virginia State Police, who were in their regular police uniforms and armed with loaded revolvers, entered upon the property of Fox Coal Mine No. 3, and served upon Mr. Fox papers, telling him that he was removed as operating manager of the mine, that he thereafter would have no connection therewith, and that the Coal Mines Administration, through Navy personnel, would operate the mine from that time on. Mr. Fox protested vigorously against this proceeding and only surrendered the keys to his property when the Navy Officers told him that if he did not give them the keys they would break the locks. Fox even went to the extent of threatening to put a chain and padlock across the driveway leading to the mine, but they assured him that if he did they would break the lock and remove the chain. Finally Fox consulted his attorney by phone and his attorney advised him to give up the keys to his property and to permit the Government agents there to take over the operation of the mine. There was nothing else Fox could do. The day of January 6, 1947, was spent largely by the Government agents taking charge of the physical assets of the property, and beginning with January 7, 1947, and continuing until the present time, the Coal Mines Administration, using certain Navy and civilian personnel, have been operating this mine.

On January 11, 1947, Fox filed his Bill of Complaint in this Court, asking a temporary injunction inhibiting and enjoining the defendants therein named, their officers, agents, servants and employees, from further interfering with the plaintiff's op-

eration of his own property, and requiring them to return to plaintiff the possession of his said property in the status that it was in prior to its seizure. The Bill further prayed for a hearing and for a permanent injunction. This Bill of Complaint consists of 18 typewritten pages, and has appended thereto 27 typewritten pages and 5 printed pages of exhibits.

Process was issued and personal service had upon the defendant, Captain R. C. Harding, who was at that time the resident officer-in-charge of Fox Mine No. 3 for the Navy. Service was also had upon the United States Attorney for this District, and copies of the process and complaint were sent, by registered mail, to the Attorney General of the United States and to the defendant, J. A. Krug. Notice was also given that on the 24th day of January, 1947, the plaintiff would move for a temporary injunction as prayed for in the Bill of Complaint.

On January 24, 1947, the defendants, J. A. Krug, N. H. Collisson, and Lt. Comdr. J. N. Franz, appeared specially and moved the Court to dismiss the complaint as to them, and to quash such service of process as may be purported to have been made on them, upon the grounds (1) that none of them having been served with process within the State of West Virginia, this Court lacks jurisdiction over their persons; (2) that none of them being an inhabitant or resident of the State of West Virginia, the venue of this action is improper; and (3) that attempted service by registered mail is insufficient. This motion was supported by the affidavit of J. N. Franz.

At the same time the defendant, Captain R. C. Harding, appeared and moved the Court to dismiss the complaint on the grounds that (1) the Court lacks jurisdiction over the subject matter of the action; (2) the complaint fails to state a claim against the defendants upon which relief can be granted; and (3) that there is a fatal lack of indispensible parties in whose absence this action can not be maintained. In the alternative the defendant, Captain R. C. Harding, moved the Court for summary judgment, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, on the ground that there is no genuine issue as to any material fact and that the defendants are hence entitled to judgment as a matter of law. This motion was supported by an affidavit of N. H. Collisson.

Both of these motions were argued orally upon January 24th, and at the conclusion of the argument counsel for plaintiff submitted a brief consisting of 9 typewritten pages, and counsel for the defendants submitted a brief consisting of 28 typewritten pages. It was immediately apparent to me that legal questions, for which there was little precedent and which might have far-reaching economic results, were being presented. I could not come to a conclusion on the questions then presented without considerable study of the arguments and authorities submitted. It was also obvious that if the plaintiff were entitled to relief, he was entitled to it as speedily as possible. If this mine was being unlawfully withheld from Fox, every day was causing him great and perhaps irreparable injury. In addition to this, I was engaged in the trial of criminal cases, involving defendants who were in jail because of their inability to give bond. Because of all these circumstances I adopted a course of procedure which was frankly novel to me, but which I felt justice impelled me to pursue; that is, I withheld my ruling upon the defendants' two motions to dismiss and one motion for summary judgment, and upon the plaintiff's motion for a temporary injunction, and directed each side to submit to me their evidence on the facts relied upon to sustain their respective motions, assuring the defendants that such introduction of evidence would in no way prejudice them on the question of whether their appearance was special or, as the plaintiff contended, was only a general appearance. Pursuant to this arrangement the parties began to submit testimony on February 18th, and same was concluded on February 28th.

I have heretofore outlined the pertinent facts relating to the operation of the Fox Mine No. 3, for the period January 1, 1946, to January 6, 1947. During this period the plaintiff received no salary for his services as manager at the mine. His

wife, Martha L. Fox, weighed the coal and received therefor $25 per week. The mine foreman, Alex Lowther, received $20 per day; a bookkeeper, Charles E. Watson, received $35 per week, making the total administrative expenses under Fox' management, $680 per month.

Following the seizure by the Coal Mines Administration, the Government employed one, J. A. Crouse, as general superintendent, at a salary of $750 a month. Alex Lowther was continued as foreman at a daily wage of $20. One, George Deaver, was employed as assistant foreman at a daily wage of $16.67. One, Richard Davies, was employed as mechanic at a daily wage of $18.30. One, E. H. Coleman, was employed as assistant mechanic at a daily wage of $13.02. In addition to these civilians, there were four officers and enlisted men of the United States Navy working at the mine. These were Lt. Comdr. Gilfoyle, whose pay and allowances amount to $594 a month; Lt. Stampfl, whose pay and allowances amount to $537 a month; and two enlisted men, Tuck and Gift, whose pay and allowances amount to $298.50 and $230 per month, respectively. The witnesses for the Government stated that it has not yet been determined in Washington whether the salaries and allowances of the Navy personnel will eventually be sought to be charged against the operation of the Fox Mine No. 3, and it is fruitless to speculate as to what the Government's position in that regard will eventually be. We see, however, that where Fox had administrative expenses of $680 per month, the Government now has administrative expenses of at least $2,850 per month, which, if the cost of Navy personnel is included, becomes $4,509.50 per month, or about five times that of Fox.

On the other hand, in the period from January 7 to January 31, 1947, the Fox No. 3 mine produced 5082.49 tons of coal, and from February 1 to February 15, inclusive, 2061.71 tons of coal. Thus the production under Government operation has not equaled twice the average monthly production under Fox' operation, but the administrative expense thereof has increased almost five times. According to the figures on Gilfoyle's Exhibits Nos. 37 and 38, the mine produced in the period January 7–31, 1947, 5082.49 tons of coal, which was sold for $16,034.78. The production cost, excluding Navy salaries and allowances, amounted to $16,858.95 for that period, giving a net operating loss, without Navy salaries, of $824.17, and an operating loss, if Navy salaries are included, of $2,360.69 for that period. And for the period February 1–15, 1947, Gilfoyle Exhibit No. 38 shows 2,061.71 tons of coal produced, which was sold for $6,737.81, with production costs, exclusive of Navy salaries, amounting to $9,713.13, or a net operating loss for the period, without Navy salaries, of $2,975.32, to which may be added Navy salaries for the period amounting to $807.25, which would bring the net operating loss to $3,782.57 for that period. These figures are revealing, in as much as they show that the mine is loosing money under Government operation and that the rate of loss is increasing very rapidly.

Opposed to this picture it was proven that Fox always operated at a substantial profit, and that in December, 1946, his net profit amounted to 78¢ per ton on coal produced. One of the Navy personnel, at a conference with Fox, said to him: "You don't have a coal mine—you have a diamond mine." The changed methods in operation would appear to have destroyed any excuse for calling this a diamond mine.

It was established by the evidence that Fox owes money amounting to slightly more than $70,000, which is secured by liens upon his equipment and upon the proceeds of the coal he sells. It was also established by the evidence that Fox has no financial resources except the small amount of surface property, his rights under the lease on 100 acres of coal, and his mining equipment. In other words, this mine must make money or Fox will be bankrupt. If Fox goes broke his creditors will suffer serious financial loss and Fox himself will be wiped out. Another consideration in this connection is the fact that Fox' lease, requiring as it does a 25¢ a ton royalty, and the fact that he must haul his coal seven miles to a railroad, makes it obvious that he will not be able to compete with more advantageously situated mines, operating under more liberal leaseholds, once the coal

market returns to normal conditions. In other words, if Fox is to pay off his indebtedness and realize some profit to himself for his labors, he must have the benefit of operating this mine while the economic conditions of the country maintain the price of coal at a high level.

In addition to the evidence as to the financial results of operation, there was considerable testimony taken as to the mining methods employed under Fox' management and under the management of the Navy. One of Fox' former foremen testified that when Fox was operating the mine you could, as he expressed it, "walk through it in your best shoes." All witnesses agreed that at that time the mine was well timbered, that the tracking was in good condition, the machinery and equipment was maintained in good working order, and that all recognized safety measures were carefully followed. A Federal Mine Inspector, who made an official inspection during Fox' management, gave this mine an excellent rating. An inspection by representatives of Fox and the Navy, which was made on January 31, 1947, revealed that the mine was very wet; that in many places the timbering was bad; that in many places the track had sunken and developed swag; that there were not proper safeguards on some of the electric wiring; and that some of the machinery was inoperative because of breakdowns, while other machinery was being operated in an unsafe condition. These conclusions, made by Fox and his representatives during the January 31, 1947, inspection, were admitted by the Navy representatives present at the same time. In addition to this it is an admitted fact that sometime in the month of February, 1947, while the mine was under Navy operation, a miscalculation was made which resulted in driving a heading so far that it broke through into an abandoned stripping operation. The witnesses for the present operators, while admitting that this break through was caused by an error in calculations, seek to minimize the damage resulting therefrom and even claim that it has enabled the mine to be pumped more advantageously by shortening one of the water pipes leading from the mine. However, the defendants introduced Gilfoyle's Exhibits Nos. 48 and 49, which were freehand drawings by J. A. Crouse, the Navy's general superintendent on duty at Fox Mine No. 3, and any one who knows anything whatever about a coal mine has only to look at these exhibits to see that if there is ever a hard rain the water coming off a considerable hill will run directly into this break through and flood the mine. The witnesses for the Government all say that there is no water coming in at the break through now, but we must remember that since the break through occurred it has been so cold around and about this coal mine that there is no water flowing anywhere on the surface of the ground. There may not be water entering at the break through now, but as sure as April temperatures will replace those of February, this mine is going to get some water at that point and perhaps enough to make it impracticable to continue mining operations.

Only one more factual matter need be touched on, and that concerns the relations which existed between Ralph A. Fox and his employees at the Fox No. 3 Mine. It was conceded by counsel for the defendants that Fox personally had no contract with the United Mine Workers of America. However the testimony establishes the fact that approximately 70% of those employed were members of the United Mine Workers of America. It further establishes the fact that no discrimination was practiced against members of that organization. Men were employed and discharged solely upon their individual merits, and no inquiry was made as to their union affiliations. Fox would check off union dues from those employees whom the union certified to him as being members and remitted the same to the union. The only occasion in which there was any concerted walk-out or strike at the mine was that occurring on August 1st, which as stated above involved solely a dispute as to the capacity of the mine cars. Once this dispute was amicably settled, the men returned to work. The other two occasions upon which work slowed down or ceased altogether happened when a general coal strike for the entire nation was in progress. To establish by proof the fact that good labor relations existed was very difficult be-

cause it necessitated the proving of a negative, that there was no labor trouble. However, every witness called to the stand, both union and non-union, testified that as far as they could tell, there were no labor troubles at the mine and, referring specifically to December, 1946, they all said that the most harmonious relations in the history of the mine existed during that month. Since the entire purpose of the President's Directive to seize the coal mines of the nation was to avoid labor difficulties, it is obvious that insofar as Fox No. 3 Mine was concerned, there was no occasion to invoke the remedy of seizure and take over the mine.

Apparently the only employees with whom Fox had any difficulty were those that he had discharged for inefficiency; namely, Skidmore, the two Schlegers, and Mayfield. The two Schlegers and Mayfield were obviously not desirable employees from any standpoint, since according to undisputed testimony they engaged in a physical assault upon another employee of the mine, Lawrence Cool, beating him with a metal pipe, threw a piece of bone coal through the window of a truck he was driving, and forced him to flee from the mine premises. In spite of this conduct, the Navy's first move after seizing the mine was to reemploy all these men who had been discharged for inefficiency and had participated in a criminal assault upon a peaceful employee. The conduct of these men had been such that Fox had been forced to seek the protection of the State Court in Monongalia County and to obtain an injunction against further violence on their part. The fact that the Navy so promptly reemployed these men and, in at least one instance, discharged a satisfactory employee to make room for them, drives one unavoidably to the conclusion that the main purpose of seizing the mine was to compel such reemployment. So much for a general statement of the facts in this case.

■ I now find as facts the following:

(1) All definite facts stated above.

(2) That there was no labor trouble at the Fox Mine from late November, 1946, through and including January 6, 1947.

(3) That the Fox Mine was operating at standard production or above from late November, 1946, through and including January 6, 1947.

(4) That the Fox Mine was capable of being operated at a substantial profit and that Fox was so operating it.

(5) That the Coal Mines Administration, acting through the United States Navy, operated the mine at a disastrous loss.

(6) That the Coal Mines Administration, acting through the United States Navy, operated the mine in such a manner as to jeopardize its entire future since they so operated it that disasters could occur which would make the mine's future operation impracticable, if not impossible.

■ Now as to the law in the case. I see no advantage in adding to the innumerable Court decisions defining what does or does not constitute such irreparable injury as will justify injunctive relief. After all, every case depends upon its specific facts. The plea that a remedy for money damages exists is made in defense of every application for an injunction. In some ways, under the law at least, any injury may be compensated by an award of money damages. Under the law even the taking of a human life may be so compensated.

■ The Supreme Court of the United States stated the whole law on the subject in Donovan v. Pennsylvania Co., 199 U.S. 279, 26 S.Ct. 91, 99, 50 L.Ed. 192, when it said: " 'When irreparable injury is spoken of, it is not meant that the injury is beyond the possibility of repair, or beyond the possibility of compensation in damages, but it must be of such constant and frequent recurrence that no fair or reasonable redress can be had therefor in a court of law.' "

The Supreme Court of Appeals of West Virginia touched upon our direct question in the case of Bettman v. Harness, 42 W. Va. 433, 26 S.E. 271, 272, 36 L.R.A. 566, in which it was held that: " 'Irreparable' means that which cannot be repaired, restored, or adequately compensated for in money, or where the compensation cannot be safely measured. The courts have generally regarded as irreparable injuries the digging into mines of coal, iron, lead, and

precious metals, and, as such injuries subtract from the very substance of the estate, and tend to its ultimate destruction, equity is said to be prompt to restrain them."

I hold that as a matter of law the facts so far proven in this case require the granting of a temporary injunction.

This leaves only the question of whether the circumstance that the defendants to be restrained are officers of the United States and purporting to act under authority of a Federal Statute prevents the remedy being applied as to them. I do not feel that any of the decisions which deal with the powers of the Federal Government in time of active warfare, to take steps necessary to the successful prosecution of that war, are applicable in this instance. We all know that actual combat had ceased a year before any of the events complained of here occurred. The Presidential Proclamation officially ending the war ended it before this mine was physically seized by the Coal Mines Administration. It is contended by the Government that the seizure took place on August 5, 1946, at which time a Government official, sitting in Washington, signed a paper stating that the mine was seized. That is not the way our Government takes its citizen's property. To hold that it is the way would completely nullify the Fifth Amendment to the Constitution.

There have also been cited by counsel for the Government numerous cases purporting to sustain the proposition that J. A. Krug, N.H. Collisson, and Lt. Comdr. J. N. Franz, could only be sued in the Courts of the District of Columbia. It is also contended that the remedy of injunction can only be granted against a person who has been served in person. If each of these positions is sound, no Government official could ever be enjoined, because if he can only be proceeded against in the District of Columbia and if it is necessary to have personal service upon him, he could simply stay out of the District and the Courts would be helpless to prevent any illegal act, including the confiscation of property. In this instance, the men complained of sent their agents into this District and through those agents took Fox No. 3 Coal Mine into their possession. If they could take the mine, acting by agents, I feel that this Court can require them to return the mine. I, therefore, hold as a matter of law:

(1) Ralph A. Fox is entitled to injunctive relief against Lt. Comdr. R. E. Gilfoyle, USNR, Successor to Captain R. C. Harding, as Resident Officer-in-Charge of Fox No. 3 Mine.

(2) That Ralph A. Fox is entitled to injunctive relief against J. A. Krug, Secretary of the Interior; N. H. Collisson as Coal Mines Administrator; and Lt. Comdr. J. N. Franz.

(3) That this is not a suit or proceeding against the United States of America, and that the United States of America is not a necessary party hereto.

An order will, therefore, be entered, refusing the two motions to dismiss, refusing the alternative motion for a summary judgment upon behalf of the defendant, Gilfoyle, and granting the motion for a temporary injunction.

I realize that the exact time at which Fox takes back his mine presents an important question. It might be that for Fox to resume operations at any time other than the beginning of a pay period would involve bookkeeping features that would cause great difficulty. I, therefore, feel that he should be given the privilege of saying when he wants the relief here granted made effective.