## DUFFIELD et al. v. MICHAELS et al.

### (Circuit Court, D. West Virginia. November 20, 1899.)

1. PRINCIPAL AND AGENT—RIGHT OF AGENT TO REPUDIATE AGENCY.
   On the breach of a contract of agency by the principal, the agent is justified in abandoning the contract and repudiating the agency.

2. SAME—REFUSAL OF PRINCIPAL TO COMPLETE CONTRACT.
   Complainants secured an oil and gas lease on a farm, made to one of their number as trustee, by which he bound himself to drill a well within two months. One of the parties interested negotiated with defendant for drilling the well, and, on his promise to secure a contract from the trustee such as defendant required, defendant moved his machinery and tools onto the leased property and commenced the well. The trustee, however, refused to make the required contract, and the lessor notified defendant that he had declared the lease forfeited. Thereupon defendant secured a new lease to himself, which he offered to turn over to complainants if they would secure payment for his work as he had originally required, which they refused to do. Defendant drilled the well nearly to completion, and again asked a settlement, which was refused. He subsequently completed the well on his own account, and, on its proving successful, complainants tendered defendant payment for his work, and claimed the well. *Held* that, having refused to obligate themselves, and compelled defendant to do the work at his own risk, they were not entitled to claim the benefit of the venture after its profitableness had been demonstrated, and that defendant was justified in repudiating any agency for complainants, if such agency existed.

3. OIL LEASE—FORFEITURE—WAIVER OF RIGHT.
   An oil lease required the lessee to drill a well within 60 days, or, in default of its completion within that time, to pay to the lessor $10 for every month until its completion; each payment to keep the lease in force for 1 month only. *Held* that, on a failure to complete the well or to make the monthly payments required, the lessor had the right to declare the lease forfeited, and that such right was not waived by his acceptance of payment for the last preceding month, the rental for previous months being unpaid.

This was a suit in equity to cancel an oil and gas lease. On final hearing.

Aug. M. Campbell, Lee & Chapman, and B. M. Ambler, for complainants.

F. L. Blackmarr and John A. Howard, for defendants.

JACKSON, District Judge. This is a bill filed in equity to cancel a lease for oil and gas purposes executed by Lewis Virgin to A. Learn on the 16th day of March, 1898, as appears by a copy filed as an exhibit in this cause. It is alleged in the bill that Learn, the lessee, paid to Virgin, the lessor, the sum of $25, "which was to be in full of all rentals and bonuses on said lease for the time of two months mentioned in said lease,"—the time in which he was to drill a well, or thereafter pay the sum of $10 per month for further delay. The bill further alleges that on March 23, 1898, Learn, by a written assignment of that date, transferred and assigned said lease to C. C. Duffield, trustee for himself and W. H. Roessle and C. C. Duffield, and that the said trustee subsequently sold and assigned to S. S. Willock an undivided one-fourth, to James A. Elphentone an undivided one-eighth, to William Muehlbronner an undivided one-eighth, and to

F. F. Murray an undivided one-eighth interest in the said lease and leasehold. The bill further alleges that Duffield, as trustee for the plaintiffs, on or about June 1, 1898, entered into a written agreement with the defendant H. E. Morris for the drilling of a well upon said leasehold. The plaintiffs are unable to produce a copy of this contract, but aver that, by its terms and conditions, Morris was to furnish a temporary rig, machinery, drilling tools, cordage, and labor, and to drill said well down to and through the first Cow Run sand, and to furnish all the machinery and appliances necessary to clean out the well for one day after it was torpedoed, and upon the completion of said contract Duffield was to pay Morris 80 cents per foot for the number of feet necessary to drill the well through the first Cow Run sand; that, after the execution of the contract between Duffield and Morris, the latter assigned the said contract to Asa A. Michaels, under which assignment Michaels entered into possession of the leasehold estate, with the consent of the plaintiffs, and commenced to drill a well thereon for oil and gas under the terms and conditions of the lease from Virgin, and of the contract between himself and Morris; that the plaintiffs furnished the casing, which was placed in the well by Michaels, as required by the contract. It is further alleged in the bill that, after the well had been drilled to the depth of 280 feet, Michaels informed Duffield by telephone, at his office, in Pittsburg, that he (Michaels) had taken a lease of the farm, which covered the Virgin lease, but, if the plaintiffs would pay for the drilling of the well to the top of the sand, that he would turn the lease over to the plaintiffs. The plaintiffs declined to recognize Michaels' new lease, claiming that their lease was in full force and effect, and they notified him to complete the well according to the Morris contract, and upon doing so he would be paid the price agreed upon for drilling the well. After this notice, Michaels continued the drilling of the well until June 27, 1898, when he informed the plaintiff Duffield by wire, at Pittsburg, that the well was down to the top of the sand, and to come to St. Marys and have matters adjusted. On the morning of the 28th of June, Michaels informed Learn that the well had been drilled through the first Cow Run sand, and was dry and made no show of oil. Plaintiffs, desiring to ascertain the truth of Michaels' statement, informed him that they wished to measure the depth of the well, when he informed them that it would be impossible, as he had removed the rig and cable, but had left the casing in the well; stating at the time that the well was a complete failure for oil and gas purposes. The plaintiffs charge in their bill that when Michaels left the well he had not drilled through the first Cow Run sand, as he represented, and did not complete his contract in that respect before removing the rig and machinery from the said well, as required by the contract. They further charge that some time in August, 1898, without notice to the plaintiffs and without their knowledge, he again placed his rig and machinery and drilling tools at said well, and commenced to drill the well deeper, for oil and gas, and that a few days after he commenced drilling the second time the well commenced to produce oil at the rate of 200 barrels per day, and at the time of the filing of the bill was producing 100 barrels

per day. Plaintiffs further allege that after the second drilling took place, and it was discovered that the well was a valuable oil well, they requested Michaels to furnish them with a statement of the amount due him for the drilling of the well, in accordance with the Morris contract, which he declined to do, and then notified the plaintiffs that he and his associates were the owners of said well and leasehold, and refused the plaintiffs any participation therein, though they were ready and willing to pay the amount, and had tendered, as well as they could ascertain, the amount due him for drilling the well under the contract. Plaintiffs aver that Michaels knew that they were at all times ready to comply with the conditions of the Virgin lease, and that, after he had entered upon the leased premises for the purpose of drilling for the plaintiffs a well according to the requirements of the Virgin lease and in pursuance of his contract with Morris, he went to Virgin and made various statements, one of which was that he was afraid of having trouble with the plaintiffs in getting his pay for drilling the well, and then and there induced Virgin to make a second lease of his farm to him; stating to Virgin that, if the plaintiffs paid him for the drilling of the well, he would turn the lease over to them upon the completion of the well. Virgin at first declined to make the second lease, but Michaels threatened him, if he did not give him a lease of the farm, that he would remove his rig, machinery, and drilling tools from the lease, and abandon the well. Thereupon Virgin, being desirous and anxious to have the well drilled, on the 21st day of June, 1898, executed and delivered to Michaels a second lease of his farm, with the express understanding that he would save Virgin harmless from all damages by reason of the execution of the second lease, which lease was recorded in the clerk's office of the county court of Pleasants county, in the proper deed book, June 22, 1898. Plaintiffs allege that they have complied with all the terms and provisions of the Virgin lease, and that Michaels failed to comply with the terms and conditions of said lease as required by his contract with Morris, but stopped the drilling of the well at a point where he knew that oil would be reached, for the reason that he was satisfied that it would prove a valuable oil well, and with the fraudulent intent of acquiring the property himself. There are other provisions of the bill that the court deems it unnecessary at this time to allude to. In the bill there are six prayers, but the only one which it is necessary at this time to notice is the third prayer, which asks for a cancellation of the lease, Exhibit B, which is the lease to Michaels, aand that the same be declared null and void and of no effect. To this bill there are three separate answers of Lewis Virgin, Asa A. Michaels, and H. E. Morris; the joint answer of Plummer Boyd and Fleming Boyd, partners as Boyd Bros.; and the joint and several answers of William Ferrell and William Smith. The answers of the defendants deny all the allegations of the plaintiffs' bill; assert and insist that, by the terms of the lease executed by Virgin on the 16th of March to Learn, it was forfeited, and that Learn and those who claim under him did not have any right to the leased premises after the forfeiture was declared.

The first question that is presented for the consideration of the

court is whether or not R. E. Bills, who at one time had an interest in the lease, held that interest at the time of the institution of this suit. It is claimed by the defendants that he had such an interest, and, being a citizen of the same state as the defendants, he could not maintain this action, for the reason that there was not such diverse citizenship as gave this court jurisdiction. No plea in abatement has been filed, setting up this fact. It is a mere suggestion of the defense in their answers. But the evidence in the case shows that he transferred or assigned his interest in the lease about the 12th of June,—long prior to the filing of this bill, which was filed September 16, 1898; and, so far as the evidence discloses, he had no interest whatever in the lease at the time of the institution of this suit. For this reason this objection to the jurisdiction of the court must be overruled.

The next question to be considered by the court, and one that is vital, is the question whether the lease was forfeited or not on the 21st day of June, 1898. This question not only involves the consideration of the lease, but the examination of a large amount of conflicting testimony in reference to this matter. This lease was executed on the 16th day of March, 1898. The term was for two years. By the terms of the lease, it was to be "null and void, and not binding on either party," if a well was not completed within two months from its date, unless the lessee would pay monthly to the lessor $10 per month for each month's delay in completing the well. Each payment of $10 was to extend the time for the completion of the well for one month, and no longer. It is apparent from the terms of the lease that unless the lessee completed a well within two months, or, upon his failure to do so, paid "a monthly rental of ten dollars for each month's delay in completing said well," then the lease was null and void.

It is claimed by the defendants, first, that there was a failure to complete the well within the time specified by the terms of the lease. This lease was dated the 16th of March. The well was to be completed within two months. There is no pretense upon the part of the plaintiffs in this action that the well was completed within the time prescribed by the terms of the lease. If this was the only condition of the lease, a failure to comply with it would unquestionably forfeit the lease; but there is coupled with this condition a provision of the lease that, if the well was not completed within the time prescribed by its terms, then after that date it became the duty of the lessee to pay to the lessor $10 per month for each month's delay in completing said well, and each payment would extend the time one month longer. These are the plain, unquestioned conditions of the lease; and a failure to comply with any one of its provisions would operate as a forfeiture of the lease, and all the rights of the lessee under it would cease from the date of the forfeiture. This brings us to the consideration of the testimony, which is somewhat conflicting in the facts in regard to the payments of the monthly installments that were required to be paid by the terms of the lease. If the lessees failed to make these payments according to the terms and conditions of the lease, their failure to comply with the terms would necessarily

forfeit their rights under it, unless there was an expressed waiver of the same, or there were acts of the lessor equivalent to a waiver. To determine this question, it is necessary to briefly review the history of the facts in this case connected with the execution of the lease to Learn, as well as the lease to Michaels. As we have seen, the lease to Learn was executed on the 16th day of March, 1898. Some time in the early part of June, 1898, Learn and R. E. Bills, who was at that time an interested party with Learn, had a conversation with H. E. Morris in reference to taking a contract for the drilling of an oil well on the Virgin farm. Subsequently a contract was drawn in writing, but Morris did not execute it. The reason Morris assigned for not executing the contract was that he could not get the tools to drill with. He then referred Learn, Roessle, and others of the plaintiffs in this action, to Michaels. Morris showed Michaels the contract, and, after Michaels examined it, he declined to drill under it, for the reason that Michaels said he was not satisfied with the responsibility of the parties, nor would he do business with Duffield as trustee; that he wanted each party that had an interest in the well to sign the contract, and also wanted the money placed in some bank, so that when the well was finished and completed he could get his money. In this conversation between Roessle and Michaels, Roessle took the contract, and said he was going to Pittsburg in a few days, and would have "the contract fixed" as Michaels wanted it, and at the same time urging Michaels to put up the rig and place the machinery, and commence drilling the well; promising Michaels that he would see that the parties complied with his terms. Duffield, the trustee, who represented the plaintiffs in this action, was seen by Roessle or Learn, or both of them, in Pittsburg, who reported to Michaels that Duffield said that he had the money in bank, and for Michaels to go on and drill the well, and when the well was finished and completed he would pay him. Michaels said this was not satisfactory to him, and that he did not know anything about the responsibility of the parties, and he wanted the money deposited at one of the banks in St. Marys, when Roessle replied that, if he (Michaels) would go on with the work, "he would see that all should be made right and to his satisfaction." These various conversations took place along in the early part of June. Michaels then made arrangements to commence drilling the well, trusting that everything would be made satisfactory. He erected the derrick and placed the boiler and machinery upon the lease, when he notified Duffield, the trustee, that he wanted things straightened up, as he had insisted previously that the provision for the payment of the drilling of the well was unsatisfactory. It cannot be denied that the first information that Michaels had of the Virgin lease was given him by Morris; that he was fully apprised of its terms and conditions; that, when he entered upon it with a view of drilling the well, he did so at the instance of Roessle and Learn, who were acting for themselves and the other owners, and did not take possession of it in his own right, but under a conditional agreement with Roessle, though protesting time and again that he would not drill the well unless the money was put up and placed where he could get it when the well was finished and com-

pleted. Confiding and relying upon the promises of Roessle, as he asserts in his answer, the boiler was placed on the lease June 17th, and the tools were placed in the derrick on the 18th, and the hole started for the conductor, which was sunk about eight feet, when the well was shut down until June 20th. There is some confusion as to dates, but that is not material. Upon the 20th Michaels was informed that Virgin wanted to see him. He went to see Virgin, and was informed by him that the lease to Learn was forfeited, for the reason that the rentals had not been paid according to its terms, that there were two months' rent still due and unpaid, and that Virgin did not want him to drill a well under a forfeited lease and lose his money. The work of erecting the rig and placing the boiler and machinery upon the lease he did under the promise made him by Roessle; expecting, when he commenced to drill the well, that Roessle would see that a proper contract was executed, and that he would see that he (Michaels) was protected. It appears that Roessle did not go to Pittsburg, as he promised in the first instance, but got Bills to write some kind of an indorsement upon the contract, expecting that would be satisfactory to Michaels, but which Michaels refused to accept. Michaels was informed, however, that Duffield, the trustee, declined to do anything except to promise to pay the money when the work was completed. This last information was obtained about the time that he was informed by Virgin that the lease was forfeited. The day after he obtained such information from Virgin, at the instance of Virgin, and with a view of protecting himself, he took from Virgin, on the 21st day of June, a new lease, and paid $10 rental upon it. Immediately after having obtained the lease he went to St. Marys, and called up Duffield, at Pittsburg, over the telephone, and told him what had transpired between him and Virgin; that Virgin had forfeited the lease, and refused to let him drill under it; and that if Duffield would return him the $10 rental, and deposit the money for the drilling of the well, as Roessle agreed to, he would assign the lease obtained from Virgin, and go on and complete the work. This statement is uncontradicted, and seems to be in accordance with the facts and history of this case. When Michaels discovered it was the intention of Virgin to forfeit the lease, he had already been subjected to considerable expense and outlay in preparations for the drilling of the well. He had erected the rig, and put his boiler, machinery, and tools on the lease, and contracted for the fuel for firing the boiler. At this point Michaels felt that he had to determine upon some line of action to protect himself. He could get nothing satisfactory from Learn, Roessle, or Duffield.

It appears from the evidence that there was never any contract between Michaels and any of the plaintiffs in this action by which he contracted to drill the well. The only thing was what Roessle promised,—that, if he would go on, he would see that all was right. As he failed to make good his promise to Michaels, he (Michaels) evidently thought he was under no obligation to any of the plaintiffs in this action; that, in equity and good conscience, he had done all that could be required of him, or that he ought to be expected to do. He repudiated any contract or agreement between him and the

plaintiffs, other than the partial understanding with Roessle, which understanding Duffield refused to ratify. Consequently there existed no binding agreement between him and the plaintiffs. No money was ever paid to him for any portion of the work during the progress of the drilling of the well. This action by both parties would seem to end all relation between them and terminate the agency, if in fact any legal relation of that character ever existed. Not only had he repudiated the contract, and given the plaintiffs notice that he was not drilling under it, but after he had taken the lease on the 21st of June, 1898, and drilled on until he got to the sand, he informed the plaintiffs, at that time, that, if they would come on and settle up with him, he would make everything right with them. This they did not do. No steps were taken by the plaintiffs to comply with this request of Michaels. Failing to reach satisfactory arrangements with the plaintiffs, Michaels moved away his rig, engine, and machinery, and informed them that he was at the top of the sand, with but little indication of oil. They gave no instructions, and took no steps towards settling or adjusting his claim against them, although he told them two or three different times that he would transfer and assign the lease to them if they would reimburse him in any outlay he had been to in drilling the well. Some time in August, after this had transpired, Michaels again returned to the well, and drilled it in and got a good well, when, for the first time, the plaintiffs offered to measure the well and settle with him. When he had previously made an effort to have them straighten up matters with him, they declined; but, after the well had proven to be a good well, they wanted to settle with him, and wanted the well, also.

In the light of the facts and history of this case, it is apparent to my mind that, while Michaels went there under the promise of Roessle "to make all things right," still, after he had notified them repeatedly that he would not drill the well under the terms and provisions of the Morris contract, nor would he drill it except on the deposit of money in some bank where he could get it (neither of which terms they complied with), he would be justified in taking steps to protect himself, especially after having repudiated the existence of any contract between them, and having notified them that he would not drill the well any further, as they failed to take any steps to assert their rights or claim to the lease. Can it be said that, after the plaintiffs in this action had failed and avoided every effort upon the part of Michaels to bring them to terms, they should, under the circumstances of this case, be permitted to reap the benefit of the risk he took, and of his labor, which resulted in producing a fine oil well? I think not. It would seem that the delay upon their part had for its object and purpose to procure the drilling of the well, and, if it were a failure, to avoid the responsibility of paying for it, but, if it proved to be a success, then to claim it, without having expended a single penny in the outlay of the well. It seems to me, under the review of the facts of this case, and the course pursued by the plaintiffs in this action, that justice requires that the court should hold, even if the lease were not forfeited, that they were not entitled to have the benefit of the labor of Michaels, for the reason that they

failed to comply with the terms of Michaels, as they had, apparently, at least, if not altogether, abandoned their rights under the lease. Michaels had on more than one occasion offered to the plaintiffs in this action to turn over the lease that he had secured from Virgin, if they would only pay him what he had paid out for his work for drilling the well. If he was an agent of the parties, then this was an offer to return what he had received from them; but we must hold, under the circumstances of this case, that he did not occupy the relation of agent to the parties, and that he had repeatedly repudiated all their propositions to drill the well upon their terms, and thereby terminated the agency, if there was ever any such relation existing between them. I reach the conclusion that the agency was terminated before the forfeiture of the Learn lease, and before the actual drilling of the well commenced, which was not until after the execution of the lease by Virgin to Michaels; and I must further hold that the action of Learn, Roessle, and Duffield was a mere effort upon their part to secure the drilling of this well without becoming responsible to Michaels for the drilling, or, in other words, if the well was a failure, Michaels would have to pocket the loss, but, if it proved to be a success, then they would come forward and claim the well under the Virgin lease.

The supreme court of the United States, in Oil Co. v. Marbury, held, upon facts somewhat similar to these, that:

"The injustice, therefore, is obvious, of permitting one holding the right to assert an ownership in property to voluntarily await events, and then decide, when the danger, which is over, has been at the risk of another, to come in and share the profit." 91 U. S. 587–593.

Such would seem to have been the policy of the plaintiffs in this case.

It is a well-settled principle of law that an agent may withdraw from the service of his principal at his pleasure, though he might be liable in some instances to damages for the violation of a contract, if any existed. Bish. Cont. par. 1050. But in this case there was no contract between the plaintiffs and Michaels which bound Michaels and made him the agent of the plaintiffs, beyond the partial understanding between Roessle and Michaels. But it is an equally well settled principle of law that an agent "may, on account of the principal's wrongful conduct, be justified in abandoning his contract and repudiating the agency." Cody v. Raynaud, 1 Colo. 272; Bishop v. Ranney, 59 Vt. 316, 7 Atl. 820; 1 Am. & Eng. Enc. Law (2d Ed.) p. 1110; Newcomb v. Insurance Co. (C. C.) 51 Fed. 725.

I have, up to this time, discussed the merits of this controversy as presented by the evidence in the case; but it is claimed that the plaintiffs forfeited all their rights in the Virgin lease, for the reason that they failed to comply strictly with its terms. The evidence in this case satisfied me there never existed any contract between Michaels and the plaintiffs; that after he entered upon the lease he repudiated all relations existing between them, which ended the agency as claimed by the plaintiffs in this action; and, from all the facts and circumstances of the evidence in this case, I am of the opinion that Michaels was justified in the course that he pursued, the object and

purpose of which was to protect himself from damage and loss in drilling a well for irresponsible parties, and for this reason alone I am of the opinion that the plaintiffs cannot maintain this action.

The remaining question to be considered in this case by the court is whether or not the lease executed by Virgin to Learn on the 16th day of March, 1898, became forfeited by reason of the fact that Learn, or those claiming under him, failed to comply with its terms and provisions. The right of a lessor to declare a forfeiture for a breach of the conditions of a contract of this character is no longer an open question. This question is well settled by numerous adjudications in our state, Ohio, and Pennsylvania. Guffy v. Hukill, 34 W. Va. 49, 11 S. E. 754; Hukill v. Guffey, 37 W. Va. 425, 16 S. E. 544; Bettman v. Harness, 42 W. Va. 433, 26 S. E. 271. This court, in the case of Gas Co. v. Jennings (C. C.) 84 Fed. 839, was called upon to pass upon the question of forfeiture, and the ruling in that case sustains the doctrine I have announced in this case. By the terms of this contract the lessee was to pay to the lessor $25 in cash, and to drill a well to completion within 60 days from its date; and, upon a failure to complete the well within the time specified, he was to pay $10 monthly rental for each and every month until the well was completed. By the terms of the lease, if the well was not commenced within 30 days from its date, $10 extra was to be paid by the lessee to the lessor for the second month, ending the 16th day of May. From the 16th day of May to the 16th day of June there would be $10 due, and from the 16th day of June to the 16th day of July there would be $10 due, making in all $30 rental money. The evidence discloses that Virgin called upon Learn after the 30 days had expired, in April, and asked him to pay the $10 extra called for by the lease; and after repeated efforts he finally, in the early part of May, got $10, which was all of the rental money he ever received before the forfeiture. By the plain terms and provisions of the lease, he was entitled to the rent of $10 per month for each month's delay in completing a well. This provision of the lease was not complied with, and on the 21st day of June, 1898, Virgin declared a forfeiture of the lease to Learn for the reason that he had not proceeded to drill the well, as required by its terms, and no steps upon the part of the lessee or those claiming under him were taken to comply with the terms and provisions of the lease for the payment of rentals due. For this reason, as well as for a failure to comply with other provisions of the lease, Virgin declared a forfeiture. It is claimed, however, that he waived a forfeiture by accepting a check, because it is written upon the face of the check that it was for the rent for the month from June 16th to July 16th. If that was a waiver, it was only for the failure to pay promptly the money for that month's rent, and was not a waiver for the preceding rentals, due on May 16th and June 16th. If the check had been for the full amount of the rentals due, although given long subsequent to the time when the rentals fell due, and the lessor had accepted it, I should hold that that was a waiver of the forfeiture of the lease for failing to pay the rentals. But such is not the fact. There were but two rentals paid, and those payments did not operate to release the

lessee from a forfeiture of all the conditions of the lease that required him to pay the full monthly rentals.

For the reasons assigned, I am of the opinion that the bill should be dismissed; but, before dismissing it, a reference will be had to a commissioner, requiring the receiver to settle up his accounts, and directing him to turn the property over to the defendant Michaels and those claiming under him.