# CHARLESTON.

## ECLIPSE OIL CO. *v.* SOUTH PENN OIL CO.

### Submitted Sept. 13, 1899—Decided Nov. 28, 1899.

I. ESTATE AT WILL—*Termination*.

"If one party may terminate an estate at his will, so may the other. The right to terminate is mutual." *Cowan* v. *Iron Co.*, 3 S. E. 120, 83 Va. 347.    (p. 87).

2. OIL LEASE—*Right to Surrender*.

An executory gas and oil lease, which provides for its surrender at any time, without payment of rent or fulfillment of any of its covenants on the part of the lessee, creates a mere right of entry at will, which may be terminated by the lessor at any time before it is executed by the lessee. (p. 88).

3. OIL LEASE—*Effect of New Lease*.

The execution of a new lease to other lessees, and possession thereunder, render such prior executory lease invalid.    (p. 88).

4. OIL LEASE—*Equity*.

An executory lease that is unfair, unjust, or unreasonable will not be enforced in equity.    (p. 89).

5. CONTRACT—*Mutuality*.

If one party to a contract is not bound to do the act which forms the consideration for the promise, undertaking, or agreement of the other, the contract is void for want of mutuality.    (p. 102.)

Appeal from circuit court, Wetzel County.

Action by the Eclipse Oil Company against the South Penn Oil Company. Decree for defendant. Plaintiff appeals.

*Affirmed.*

HUBBARD & HUBBARD, J. R. SUMMERVILLE and ROBERT McELDOWNEY, for appellant.

U. N. ARNETT, A. B. FLEMING and M. F. ELLIOTT, for appellee.

DENT, PRESIDENT:

This is a controversy between the Eclipse Oil Company, appellant, and the South Penn Oil Company and others, from the circuit court of Wetzel County, over a lease in the following words, to wit: "Agreement made and entered into this 11th day of May, A. D. 1897, by and between Henry Garner, of the county of Wetzel and state of West Virginia, of the first part, and H. J. and J. C. Stolze, parties of the second part, witnesseth, that the said party of the first part, for and in consideration of the covenants and agreements hereinafter mentioned, does covenant and agree to lease, and by these presents has leased and granted, the exclusive right unto the parties of the second part, their heirs or asisgns, for the purpose of operating and drilling for petroleum and gas, to lay pipe lines, erect necessary buildings, re-lease, and subdivide, all of that certain tract of land situate in Proctor district, Wetzel County, and state of West Virginia, and bounded and described as follows, to wit: Bounded on the north by lands of C. Parsons' heirs, on the east by the lands of Burton, on the south by the lands of Isaac and William Smith, on the west by lands of James Newman; containing 102 acres, be the same more or less. The parties of the second part, their heirs or assigns, to have and to hold the said premises for and during the term of 3 years from the date thereof, and so long thereafter as oil or gas can be produced in paying quantities. The parties of the second part, heirs or assigns, agree to give to the first party $\frac{1}{8}$ part of all petroleum obtained from the said premises, as produced in a crude state; the said $\frac{1}{8}$ part of the petroleum to be set apart, in the pipe line running said petroleum, to the credit and for the benefit of the said party of the first part. The said party of the first part is to fully use and enjoy the said premises for the purpose of tillage, except such part as shall be necessary for said mining purposes, and the right of way over and across the said premises to the place or places of mining or operating. The said parties of the second part are further to have the privilege of using sufficient gas and water from the premises herein leased to run the necessary engines, with the right to secure any machinery, fixtures and buildings placed on said premises by the said parties of the second part or those

acting under them, and are not to put down any well for oil on the lands hereby leased, within 50 rods of the buildings now on said premises, without the consent of the said party of the first part. Damages done to growing crops shall be paid by second party. It is agreed that, if gas is found in paying quantities, the consideration in full to the party of the first part for gas shall be $200.00 (two hundred dollars) per annum for the gas from each well, when utilized off the premises; gas free of charge for household uses to first party. The parties of the second part agree to drill one test well on the above described premises within six months from the execution of this lease, or, in lieu thereof, thereafter pay to the said party of the first part one dollar per acre per annum until such well is completed; and if said test well is not completed within six months from the above date, or rentals paid thereon, this lease is null and void, and not further binding on either party. And it is furher agreed that the second parties, their heirs or assigns, shall have the right at any time to surrender up this lease, and be released from all moneys due and conditions unfulfilled; then and from that time this lease and agreement shall be null and void, and no longer binding on either party, and the payments which have been made held by the party of the first part as the full stipulated damages for nonfulfillment of the foregoing contract; that all conditions between the parties hereto shall extend to their heirs, executors, and assigns. In witness whereof, we, the said parties of the first and second parts, have hereunto set our hands and seals. Henry Garner. [Seal.] H. & J. C. Stolze. [Seal.] Witness: Sam J. Beck." This lease was assigned to the Eclipse Oil Company. On the 18th day of June, 1898, the lessor again leased this property to J. A. Phillips, who assigned to the South Penn Oil Company. The latter company began developements, when the Eclipse Oil Company obtained an injunction, claiming that its lease was still valid, although nothing was done thereunder except the payment by it of the annual rental provided for on the 10th day by November, 1898, and alleged acceptance thereof by the lessor. The injunction was dissolved on motion, and plaintiff appeals.

The effect of the last clause of the controverted lease ap-

years to have been overlooked by counsel. It is in these words: "And it is further agreed that the second parties, their heirs or assigns, shall have the right at any time to surrender up this lease, and be released from all moneys due and consideration unfulfilled; then and from that time this lease and agreement shall be null and void, and no longer binding on either party," etc. This clause apparently destroys this lease, or renders it invalid, at least until some consideration has passed from the lessee to the lessor. Lessee's counsel claim that he was not bound to do anything or pay anything until eighteen months from the date of the lease, and in the meantime he has the right to surrender it, and thereby be released entirely from any obligation whatever. This renders it, to this extent, *nudum pactum*, by which the lessor is not bound any more than the lessee; and, until something is done in consummation thereof, either party may terminate it. "If one party may terminate an estate at his will, so may the other. Right to terminate is mutual." *Cowan* v. *Iron Co.*, 83 Va. 547, 3 S E. 120; *Petroleum Co.* v. *Coal, Coke & Mfg. Co.*, 89 Tenn. 381; 18 S. W. 65; *Knight* v. *Iron Co.*, 47 Ind. 105; *Pidgeon* v. *Richards*, 4 Ind. 374; 2 Bl. Comm. 135. The lessee was out nothing, at no expense, and running no risk, and yet he makes the conditions of his contract such that the lessor cannot tell for eighteen months whether the contract is to be binding on the lessee or not. In the meantime, he receives nothing for his delay. As Judge Brannon says in the case of *Roberts* v. *Bettman*, (W. Va.) 30 S. E. 95, "The covenant to pay is brought to birth by the lease, only to die at the hands of its mother,"—a case of fetal strangulation which kills the mother. The lessor had the right to terminate this *nudum pactum* at any time, which he effectually did by making a new lease, and giving possession of the premises to another. 12 Am. & Eng. Enc. Law, 757; *Kelly* v. *Waite*, 12 Metc. (Mass.) 300; 2 Bl. Comm. 146; *Guffy* v. *Hukill*, 34 W. Va. 49, (11 S. E. 754), 8 L. R. A. 759. Nor can declarations or conduct on his part affect the rights of his new lessee. The lessor's conduct in receiving the rent and recognizing the prior leases after he had parted with the estate would be of very little weight, if admissible as evidence, for he "was an old, fee-

ble man, easily influenced." It must be presumed that the lessor, in executing the last lease, intended to do and did what he had the legal right to do. The lessees, having the mere right of entry, were not bound to do so, and could escape the payment of any consideration at any time, at their will, by surrender of the lease. They could hold on for years, or until their lessor pressed for his rent, and then surrender his own lease in satisfaction thereof. This is not like the lease in the case of *Roberts* v. *Bettman*, cited above, and in which the majority of this court held that the lessor was entitled to demand rent until the lease was surrendered. That lease provided that at any time the lessee might surrender the lease, and "thereafter be discharged," while this lease provides that the lessee "shall have the right at any time to surrender up his lease, and be released from all moneys due and conditions unfulfilled." It is a complete release, as referred to in Judge English's dissenting opinion in the case last cited. Nor was the right of the lessor to terminate the lease raised in that case. But both parties having allowed the lease to remain in being for a certain length of time, without any effort on the part of either party to terminate it, the court held that the lessee, having retained the lease and enjoyed its benefits, could not take advantage of his own wrong to escape the payment of the accrued rents. It was admitted that he could surrender at any time, and thereafter be discharged, while under the present lease the lessees could surrender, and were released. There was nothing to bind them to pay rent or explore. These matters were as completely at their will as though they had signed no lease. The lessor, by execution of the junior lease, passed all his right to his lessee; and, if there was anything necessary to be done to terminate the senior lease, the lessee had the right to do it. It might be possible to show in some way that the junior lease was not intended to take away the right of entry of the senior lessees. There would have to be proper allegations to this end in the bill. It contains none, and the presumption is that there are none. The plaintiff rests its case entirely on the validity of its leases. The defendant's lease renders them invalid. The plaintiff was at no expense or loss before it had full notice of the termination

of its leases.   Such  termination  was  neither  inequitable
or  unconscionable, but  rid  the lessor of a dubious, specu-
lative  contract, liable to be defeated at any moment, to his
loss and injury, by his  lessees.   The plaintiff  afterwards
paid the rent at its own risk, and, with wide-open eyes, as-
sumed  the  consequences,  thereof.   This  determination
renders it unnecessary, to construe the  thereafter  clause
so  eloquently  and  earnestly  dwelt  upon  by  the  learned
counsel on  both sides of  this litigation, and  the questions
raised will be left open for future consideration in a proper
case.

There is another ground for which this lease should not
be enforced by a court of equity, and that is its unfairness.
The lessor  executed this  lease with  the  expectation of a
prompt  development  of  his  land.   The  lessees  deceived
him by the covenant to sink a well in six months, and then,
under the pretense of fixing a penalty, in the shape of ren-
tal, for failure to complete the well in the  time prescribed,
skillfully  turned  it  into  a  speculative  lease,  for  rental
merely, which, according to their claim, they had eighteen
months, and  so  much longer, as  they could  postpone the
same, to decide to  pay or not.   This evidences a plain in-
tention on  their part not  to explore for  oil or gas, and the
covenants in relation thereto were simply a blind to deceive
the confiding lessor.  It is decidedly a one-sided lease, and,
if the  lessor had  remained quiet, they  could  have  held it
for an indefinite period without either exploring for gas or
oil or paying  any rent.   That  only those  contracts which
are fair, just, and reasonable will  be specifically  enforced
is an  unquestionable doctrine of equity, and  any trace of
unfairness  will  render  specific  performance  impossible.
22 Am. & Eng. Enc. Law, 1022;   *Vogel* v. *Pekoc*,157 Ill. 339,
42 N. E. 386, 30  L. R.  A.  491;  *Weaver* v, *Weaver*,  109  Ill.
225;  Chit. Cont.  155.;  Bish.  Cont.  32;  1·Whart. Cont.  5;
*Marble Co.* v. *Ripley*,  10 Wall.  339, 19 L. Ed.  955;  *Alworth*
v. *Seymour*,  42  Minnh. 526, 44  N. W.  1030.   The  decree
complained of is affirmed.

### ON PETITION FOR REHEARING.

### (Feb. 5, 1900.)

In their petition and argument for  rehearing, plaintiff's

counsel earnestly urge at least six several reasons why a rehearing should be granted in this case, with such force and sincerity as compel a careful consideration of them necessary; and, if any of them are well founded in law, rehearing should follow as a matter of course. If they are all plainly untenable, then the rights of the appellee to have a speedy end of this litigation should prevail over any disposition the court or its members may entertain of according to the attorneys·the privilege of reargument for their own or their client's satisfaction.

The first position is that the Court decided the case on a point not fairly arising on the record, in total disregard of points raised in argument by counsel on either side, and fairly arising upon the record. This presents at once the question, what is the point fairly arising upon the record which was decided by the circuit court, and then brought to this Court to be reviewed by it? It was the dissolution of the plaintiff's injunction. And this is the sole point fairly arising on the record presented for the consideration of this Court, and the question is, did the circuit court err in dissolving the injunction? The circuit court's conclusion may be right, and its reasons therefor wholly wrong; yet this court will never reverse a right decision because the reasons advanced in support thereof may be baseless. It is the duty of this Court to affirm the decree, if the record justifies it, notwithstanding that the circuit court and the counsel may be laboring under an entire misapprehension as to the true merits of the controversy or the questions involved. Nor do the reasons by which the circuit court was actuated anywhere appear in this record. Counsel have seen fit to have an entertaining contest over what they consider to be the reason by which the circuit court was controlled in reaching its conclusion. This, however, is not a moot court, and cannot be governed by the consent or argument of counsel, but it must administer justice as the very right is made to appear from self-inspection of the record. This is the law, and there is no decision of any court to the contrary. It is in perfect accord with the provision of the constitution, to wit, article 8, section 5: "When a judgment or decree is reversed or affirmed by the supreme court of appeals every point fairly

arising upon the record of the case shall be considered and decided; and the reasons therefor shall be concisely stated in writing and preserved with the record of the case." It is not the opinion of the counsel as to what they consider, agree, or argue may be the points in issue, either in their petitions or briefs, but what the record itself discloses, that the court must decide. The circuit court, in determining the single point presented to this court, to wit, the dissolution of the injunction, necessarily held that the plaintiff was not entitled to the relief sought, but that its equity, for some reason, in some respect was defective. The circuit court is not required to give its reasons, and if it did, and they were insufficient, this Court would not in any sense be governed by them; but it must examine the record, and ascertain whether the decision is sustained thereby. Counsel who are presumed to be fully advised of the law have the right to set up and knock down as many straw propositions as they please, but they cannot compel the court to follow their example, or require it to be bound by their conclusions. Neither can they compel the court to enter into the discussion of propositions of law not necessary for the decision of the points of error presented to the court for its determination. This Court must presume that the circuit court was controlled by the true legal reasons justified by the record for its conclusion, rather than insufficient ones presented by the counsel in argument. Counsel undoubtedly confound the points fairly arising on the record with the legal reasons to be given in support of the decisions of such points. The authorities referred to and relied on clearly show this to be the case. For instance, the case of *Kesler* v. *Lapman*, 46 W. Va. 293, (33 S. E. 289). In this case, and numerous others, this Court has held that points not determined by the circuit court will not be considered by this Court on appeal. *Robrecht* v. *Robrecht*, 46 W. Va. 738, (34 S. E. 801); *Woods* v. *Campbell*, 45 W. Va. 203, (32 S. E. 208); *Bank* v. *Gould*, 42 W. Va. 137, (24 S. E. 547); *Alderson* v. *Commissioners*, 32 W. Va. 461, (9 S. E. 863); *Harris* v. *Hauser*, 26 W. Va. 206; *Armstrong* v. *Town of Grafton*, 23 W. Va. 50; *Burke* v. *Adair*, Id. 165. But this Court has not held nor would it possibly do so, that a wrong legal reason given

for a right decision of a point presented would render such decision erroneous, and that it would be reversed and sent back, that the court might correct its reasons to correspond with its conclusion. A point of law, while it may affect, is not equivalent to, the point of error at issue in a controversy; for it may give rise to and be governed by numerous points of law, and, while the court may be in error as to the one, it may be right as to the other. This Court is in duty bound to consider any questions of law relating to the point in issue, whether mentioned or overlooked by counsel, without notice to them; and in rule 5, § 4, of the long-established rules of this court (23 W. Va. 823), the Court gives notice that it will notice any point of error, whether assigned or not. This is its legal duty, without regard to any rule on the subject. The Court sits to administer justice, and not to teach or be taught law. When the question is a plain, legal one, it is not incumbent on the Court to call counsel's attention to it, or request argument concerning it. For the very reason that argument is not necessary in its determination. The Court must be presumed to know some of the elementary principles of law, and capable of passing thereon, without the assistance of counsel.

By its suit the plaintiff put the validity of its own lease in issue. In dissolving the injunction, the circuit court necessarily held the lease, for some reason, inoperative. The counsel in argument, give a reason for the action of the circuit court. It may be the true one, but this Court cannot be governed by it. On inspection of the lease for construction, it finds it plainly invalid for other reasons than those asserted; thus sustaining the conclusion of the circuit court. This it was its duty to do, it matters not how unfavorably such action may impress the defeated litigant, and counsel. That the decision is just, and in accordance with law, conscience, and duty, should be a sufficient shield to ward off the pointed arrows of criticising sarcasm, though poisoned with the malevolence of defeat. The clause of the lease on which counsel think this controversy hinges is a very doubtful one, susceptible of as many constructions as minds; and while, in accordance with *Bettman* v. *Harness*, 42 W. Va. 433, (26 S. E. 271); 36 L. R.

A. 566,—being merely speculative in its nature,—it should be most strongly construed against the lessee, yet any construction thereof must be subject to the most serious doubts, with the probable result of great legal injustice. Such being the case, it is far better to uphold the conclusion of the circuit court by legal propositions and application thereof to this lease, about which there can be no doubt except in minds warped and biased by some personal interest.

The second reason urged by the plaintiff is "that the conclusion reached by the Court upon the question it originated is not warranted by the law." The plaintiff, in instituting its suit to have its lease declared valid, and not the Court, originated the question involved. When it came into equity, it should have presented a lease not already avoided, and not sought the enforcement of a contract thus rendered unconscionable. Points of distinction are attempted to be shown between this case and the case of *Cowan* v. *Iron Co.* cited. That was a case to cancel a lease which the lessee claimed to be an absolute deed. The court held that because it contained a stipulation that the lessee should "have the right and privilege of removing from the said tract of land at any time any machinery, buildings, and fixtures or improvements made or erected upon it by the lessee," such stipulation authorized the lessee to terminate the lease at any time, and, the lessee having such right, the lessor could do likewise, as the right to terminate must be mutual. In the present lease the right to terminate is not left to mere inference, but it is expressly reserved to the lessee; and, after the lease had been formally terminated by the lessor executing a new lease, the lessee brings suit to enforce it. In that case the lease was for the purpose of producing metal ores; in this, it is for the production of oil. In that case the lessee was not to pay anything unless he should produce ore. In this case the lessee was not bound to pay anything unless he chose to do so. In that case the term was indefinite. In this, the term of three years is specified. In that case the lessee entered into possession, mined some ore, and made payments therefor, and then ceased operations for the reason that they were not remunerative. In this case the plaintiff neither entered into possession nor paid any ren-

tals or other consideration, until after the lessor terminated the lease by the execution of a new lease to others. In that case the lessee could have held forever, if the lease was held valid, without doing anything or paying rent. In this case the lessee could have held for eighteen months, if its claim was held valid, without doing anything or paying anything. The points of similarity as to the essentials are much greater than the points of dissimilarity nonessential in their character, so far as the law governing them is concerned. "It is a well-settled and well-known rule of law that a lease or estate which is at the will of one of the parties is equally at the will of the other party. One of them is no more and no further bound than the other. As the lessee in this case had the clear right, at his will, to terminate the tenancy at any time, so had the lessor. It cannot be otherwise." *Knight* v. *Iron Co.*, 47 Ind. 105, cited. The lease in the case just referred to was a conveyance of all the mineral coal, limestone, iron ore, fire clay, and oil, in consideration of one dollar; and it further provided for the payment after ten years of a rental of five dollars in advance, and for royalties on the coal, etc, and oil mined and produced. It contained the stipulation that the lessee "shall have the right to abandon said lands and mining at any time and remove all his buildings and fixtures from said land." The court said: "This must be regarded as the creation of an estate at will. It is a stipulation which applies to the whole interest of both parties under the instrument, and every section and clause in it. The lessee has only to will it, and every part of the instrument, and every interest under it, whether of the lessor or of the lessee, is at once at an end." This language applies equally to the surrender clause of the present lease, which is just as strong as the one under discussion, for both are as strong in favor of the lessees as language can make them. In the case of *Pidgeon* y. *Richards*, 4 Ind. 374, cited, a lease of land for a valuable consideration at the pleasure of the lessee was held to be also at the pleasure of the lessor. In the case of *Petroleum Co.* v. *Coal, Coke & Mfg. Co.*, 89 Tenn. 381, 18 S. W. 65, it was held that a mining lease for ninety-nine years was *nudum pactum*, if construed to impose no legal obligation upon the lessee to ex-

plore and discover mines, or to work them when discovered; that such construction would controvert it into a mere voluntary option, that the lessor could withdraw at any time before acceptance. Under the provisions of the lease in controversy, there was no obligation upon the lessee to explore or pay rent; but he reserved the voluntary option to surrender it at any time, without legal obligation to do anything or pay anything. Hence the lessor had the right to vacate it at any time while in an executory state. The lessees had the right at any time to say, "This lease is at an end," and thus put a complete end to the rights of both parties under it. It therefore created a mere estate at their will, and, being at their will, it was at the will of the lessor, also. There is no escape from this conclusion, and it has been the law, undisputed, from time immemorial. 2 Bl. Comm. 145; 4 Kent, Comm. 111; Washb. Real Prop. 505; Co. Inst. 55a. Nor does the three-years term agreed on change or affect this conclusion. This is merely a fixed period, without binding consideration, beyond which the lessees could not hold the estate, even by their own election, though the lessor took no action. It was to terminate the estate by its own vigor, without effort on the part of the lessors. It in no sense took away the right of the lessee to terminate the estate at his pleasure, and therefore it could not do so as to the lessor, as this right, if it exists, must be mutual; for there was no valuable or enforceable consideration for it. There was nothing binding the lessee to produce oil or gas. But the continuance of the lease was entirely dependent upon the commutation or forfeiture clause for both consideration and extension.

The third proposition relied on by the plaintiff is that, admitting the lease to create an estate at will, there was no notice to quit, and a number of authorities are cited to show that some notice is necessary for the protection of the party to be dispossessed. This may be by demand of possession or notice to quit. 4 Kent. Comm. 111; 2 Bl. Comm. 146. But where there is no possession, and no injury can result to the lessee, such as the loss of crops, a re-leasing of the same premises is a sufficient notice. Re-entry is always sufficient notice, but there can be no re-entry where the lessee has never been in possession. 12 Am. & Eng. Enc. Law, 757; *Kelly* v. *Waite*, 2 Bl. Comm.

146; and *Guffy* v. *Hukill*, cited in the original opinion in this case. Nor could the after reception of rent by the lessor operate as a waiver of notice in favor of the plaintiff, as against the subsequent lessees. The latter had their leases duly recorded on the 15th day of August, 1898, and thereby the plaintiff had constructive notice thereof, both at the time of its alleged payment of rent, and at the time it acquired its interest in the prior leases, to wit, the 1st day of September, 1898. It was fully advised of the appellee's rights prior to the acquirements of its interests, and legally knew that the lessor had parted with his interest to the South Penn Oil Company, and that its leases, having been thereby terminated, could not be revived by payment of rent to him, and that he had no right to receive it; but, if paid to any one, it should have been to his assigns or subsequent lessees, who had the right to refuse it, or not, at their pleasure. This is provided the subsequent lease is valid, and not in condition to be terminated at the time of the payment of the rent under the first lease, and provided, further, that the payment of the rent has the effect to renew or continue the life of the first lease. Strictly speaking, the money paid was not rent, but was commutation to secure the extension of the time of forfeiture for failure to complete a well within the period of six months elapsed from the date of the lease. Therefore its payment did not renew or keep the lease alive, except that it prevented its becoming invalid, under the forfeiture clause, as to the lessor, but not as to the subsequent lessees. It in no wise affected the surrender clause prior to the time of its payment. Nor did it bind the lessee to pay such commutation in the future. But this was still at his discretion. It was a mere voluntary payment for something already enjoyed, and not for future enjoyment Hence it could not revive a lease already terminated under a different provision, or operate as a termination of the subsequent lease. Nor was the subsequent lease in the present case in a terminable condition at the time of the payment of such commutation. While the surrender clause is somewhat similar, and sufficient to render it the grant of an estate at will, terminable by either party during its mere executory existence, there are other provisions, entirely dissimilar, which, when put into execution, destroyed for a time, at least, its terminable

character.    The forfeiture clause is in these words:
"Provided, however, that this lease shall become null and
void, and all rights hereunder shall cease and deter-
mine, unless a well shall be completed on said premises
within two months from the date hereof, or unless
the lessee shall pay at the rate of twenty-five dollars and
fifty cents quarterly in advance for each additional three
months such completion is delayed from the time above
mentioned for the completion of such well until a well is
completed.    Such payments may be made direct
to the lessors or deposited to their credit in the Marion
P. O., in Wetzel county, W. Va.''    This lease was
executed on the 15th day of June, A.D. 1898.    No pretense
is made that it was terminated during the two months in
which it remained in an executory state, nor is there any
pretense or allegation that thereafter the commutation of
twenty-five dollars and fifty cents was not paid in advance
quarterly until a well was completed.    The receipt of this
quarterage in advance would necessarily suspend the
terminable character of the estate during the time for
which it was paid.    In the absence of any allegation to the
contrary, the presumption is that this quarterage was duly
paid and received, and that the lease was at no time termi-
nable before possession taken thereunder; and the comple-
tion of a producing well changed the lessees right of ex-
ploration into a vested estate for five years, and so long
thereafter as oil and gas should be produced in paying
quantities.    The commutation in the plaintiff's lease was
not to be paid until after the benefits were received, and
was then at its option, while in the subsequent lease it was
to be paid in advance, before benefits received, and failure
to pay it forfeited the lease.    It is true that the plaintiff
would now have the surrender clause given a different con-
struction, but the language is too plain for misconception.
It is here again repeated: "And it is further agreed that
the second parties, their heirs or assigns, shall have the
right at any time to surrender up this lease, and be released
from all moneys due and conditions unfulfilled; then and
from that time this lease and agreement shall be null and
void, and no longer binding on either party, and the pay-
ments which shall have been made be held by the party of
the first part as the full stipulated damages for non-fulfill-

ment of the foregoing contract." If no payments have been made, although due, the lessor receives nothing, as all moneys due are to be released, all conditions unfulfilled to be discharged, and the agreement to be no longer binding on either party. Language could not be made stronger to relieve a lessee from all obligation at his own will and pleasure.

The fourth contention of the plaintiff is that its lease is not a *nudum pactum*, without consideration, and void by reason thereof. It insists that it is made under seal, which imports consideration, and that a party to it cannot avoid it, for this reason. This would be true at law. 3 Am. & Eng. Enc. Law, 827; *Harris* v. *Harris*, 23 Grat. 738. It is not true in equity. "It is a fundamental principle of equity to refuse aid to the enforcement of executory deeds, unless founded upon either a good or a valuable consideration. The presence of a seal does not, in equity, import a consideration." It has no force. 6 Am. & Eng. Enc. Law, (2d Ed.) 683; Adams, Eq. 78; Fry, Spec. Perf. § 96; Pom. Spec. Perf. § 57; *Lamprey* v. *Lamprey*, 29 Minn. 151, 12 N. W. 514; *Buford's Heirs* v. *McKee*, 1 Dana, 107. If there was any consideration for the lease, other than that mentioned in the lease, it was the duty of the plaintiff to allege it; otherwise, the contract itself is conclusive on this question. The only considerations mentioned in the lease are the royalties and rentals on oil and gas to be produced, and the commutation for failure to complete a well. The plaintiff was not bound to complete a well in any given time, or during the life of the lease, so as to produce oil royalties or gas rentals, but in lieu thereof might pay a commutation, which he reserved the right to defeat at any time before payment enforced by surrender of the lease. It was entirely optional with him to bore or not, or pay or not. He was not bound to do either, but could decline to do both. This lease is not capable of any other construction. A consideration mentioned which is not legally enforceable is equivalent to no consideration, and a contract dependent thereon is as much a *nudum pactum* as if no consideration were mentioned. "Where two parties to an instrument enter mutual covenants which are interchangeable considerations for each other, if either party

neglects or refuses to bind himself he thus renders the instrument void for want of mutuality, and he cannot avail himself of it as obligatory upon the other, nor can he render it obligatory upon the other by any subsequent act of his own, without the latter's assent." *Dodge* v. *Hopkins,* 14 Wis. 630. "Want of mutuality in the inception of the contract may be remedied by the subsequent conduct of the parties, or by the execution of the agreement." 7 Am. & Eng. Enc. Law, (2d Ed.) 114, 115. Plaintiff's lease shows on its face that it was entirely optional with the lessee to perform it, or not, at its pleasure; and the Pennsylvania cases referred to in argument do not militate against this construction, for it is impossible to give it any other. In the case of *McMillan* v. *Philadelphia Co.,* 159 Pa. St. 142, 28 Atl. 220, the language, "he [the lessee] having the option to drill the well or not, or pay said rental or not," was held not to give the lessee the option to refuse to do both, but that he must do either the one or the other, to render them consistent with other provisions of the lease. The same holding was had in the case of *Jackson* v. *O'Hara,* 183 Pa. St. 233, 38 Atl. 624. These decisions are not applicable to this case, for it is impossible to construe plaintiff's lease so as to take away its optional right to surrender it at its pleasure, without paying anything therefor. The surrender clause in the lease construed in the case of *Hooks* v. *Forst,* 165 Pa. St. 246, 30 Atl. 846, is in the exact language contained in the plaintiff's lease. But the former lease contains no forfeiture clause, and in the granting clause the consideration of one dollar in hand paid is acknowledged, and it is further stipulated that the lessees should pay one hundred dollars per month, begining with the date of the lease, until a well is completed, the payments being made in advance; and the following receipt is embraced in the lease: "November the 30th, 1889. Received from Lahey, Campbell and Stoughton $100 for rent on lease in full to December the 30th, 1889." The lease also acknowledges the first payment, for the month of November. The lessor, receiving a valuable consideration for the term, could not terminate the lease until the end thereof, although it was still at the will of the lessor, who had the right to waive his payments and terminate the

lease at his pleasure.    The January  payment  becoming
due, the lessees  asked for three weeks to  make it, and, in
case it was  not then made, agreed  that  the lessor  might
consider  the  lease  abandoned, and  relet to others.    The
court held  this to be a surrender of the  lease, although it
was not actually given up, and that the lessees could not af-
terwards tender  the payments due, and thereby renew it,
without the consent of  the lessor.    The case of *Roberts* v.
*Bettman*,  54  W.  Va. 143,  (30 S. E. 95), has  no  application,
whatever to the present case.    That was a suit at  law for
rentals.    In that  case, while both parties  had the right to
terminate the  lease, one under  the forfeiture clause, and
the other  under the  surrender  clause,—neither  took the
necessary steps to  do so, but the lease was allowed to con-
tinue  in  existence for  the benefit of the lessee; and  the
court held the  lessor was  entitled to his  rentals until the
lessee terminated the lease by a surrender thereof.    It was
admitted  that both  parties had  the right to  terminate it,
but  that neither had  done so.    Nor  was the  lease invalid
for want of consideration, for  the lessee stipulated to  pay
one hundred dollars per month in advance until a well was
completed, or  until he  surrendered the  lease, and  only
thereafter  was he  to be  relieved from  the monthly pay-
ments.    The two clauses of forfeiture and surrender were
held not to be self-acting, but to require some action on the
part of  one or  both the parties to terminate  the lease, and
the termination thereof  only destroyed the  after-accruing
rights of  the parties.    The  plaintiff's lease, on  the other
hand, failed to  legally bind  the lessee  to pay any  rentals
for  (as claimed by  it) eighteen  months, and  then, as it
now would  rather not claim, on mere  surrender  released
it from all moneys due,—a generous lease to the lessee, but
unfair to the lessor.    It is true  that most oil leases have a
surrender clause, but it is also just as true that, as to con-
sideration, they  vary as the leaves of  the forests; and the
consideration, in  so  far  as the lessor  is concerned, gov-
erned the  surrender clause.    Without consideration, an
.executory lease may always be vacated or terminated; with
valuable  consideration, it  cannot  be.    The  length of the
term  or the  character of  the estate  makes no  difference.
The courts will not enforce executory contracts not on con-

sideration deemed good or valuable in law.  *Barrett* v. *Mc-Allister*, 33 W. Va. 738, (11 S. E. 220), has no application to this case, for the reason that the appellee's subsequent lessees are presumed to have been aware of the invalid character of plaintiff's lease at the time they obtained their lease.  They knew that the plaintiff had the right to terminate, and that he could not thereafter renew it in derogation of their rights acquired for valuable consideration.  Nor could plaintiff's lease be treated as an ordinary option for sale or rent, for the reason that it was for a term that might expire before plaintiff made up his mind to accept it and thus the lessors' estate involved be lost, without a compensation to him therefore.  A man offers to lease a house to another for one year, beginning at a certain date, for one hundred dollars; the tenant to have the liberty to pay or not to pay the rent, if he chooses.  The tenant, to make this contract binding, must either pay, or agree in advance to pay, the rent; and he cannot wait until the term expires before binding himself.  Otherwise, the lessor loses his term, and receives nothing for it.  If the tenant is not legally bound to pay the one hundred dollars, the contract is void; for it is founded on a nonenforcable consideration, which is equivalent to no consideration.  The landlord is neither bound to give the tenant notice, nor await until the expiration of any part of the proposed term, before reletting to some one else; but it is the duty of the tenant to notify him of acceptance before the beginning of the term, which he may do by paying or agreeing to pay the rent.  The most that can be said of this lease is that it was no more than an option, without consideration, which might be withdrawn at any time before acceptance; and the leasing to another, with or without notice to the prior lessee, was a withdrawal thereof.  *Coleman* v. *Applegarth*, 68 Md. 21, 11 Atl. 284; *Dickinson* v. *Dodds*, 2 Ch. Div. 463; Pom. Spec. Perf. §§ 60, 61.

The fifth contention of the plaintiff is that the court erred in holding that its bill was in its nature a suit for specific performance, and subject to the equitable rules that control relief in such cases.  It is probably true that the plaintiff might have brought a suit in ejectment or unlawful detainer for the enforcement of its lease, but it

chose to come into equity. Counsel should not permit the ill-considered remarks of a judge to mislead them as to the law, for judges may err. Equity has the right to specifically enforce leases, and the covenants therein contained, when relief at law is inadequate. In the case of *Clay* v. *Powell*, 85 Ala. 538, 5 South. 330, it was held that a bill would lie to enforce a covenant in a lease, "upon the principles analogous to those governing the equitable remedy of specific performance." And in 22 Am. & Eng. Enc. Law, 972, the law is stated to be, "Leases of real estate, agreements to lease, and contracts in relation thereto, including covenants in contracts of lease, are enforceable specificially." The alleged ground of equitable relief is the prevention of waste or irreparable injury, but, having taken jurisdiction for one purpose, equity will go on to give full relief. *Bettman* v. *Harness*, 42 W. Va. 433, (26 S. E. 271), 36 L. R. A. 566, cited. Specific execution is not confined to the making of deeds, but is the giving of any relief the nature of the case may demand. 22 Am. & Eng. Enc. Law, 1079. Equity does not merely stay waste, and send the plaintiff to law to establish its title and enforce its contracts, but it goes on to specific execution thereof. Plaintiff prays that this be done; that its leases may be held to be valid and subsisting, and the subsequent leases invalid, and that it be decreed to have the exclusive right to operate for oil and gas on the lands involved; and that the subsequent lessees be enjoined from preventing it from taking possession thereof, and be required to account for the value of the oil already produced. If this is not enforcing specific performance of this contract, what is it? It is certainly not a divorce suit, or a bill to dissolve a corporation. It is, however, an ejectment in chancery. Ejectment is the proper remedy for enforcing specific performance at law. To declare a contract valid, preserve the subject-matter thereof, and turn it over to the contractee, is certainly specific performance of such contract; and the difference being that when tried at equity or at law, the separate rules as to relief governing the separate tribunals must prevail,—one being a court of conscience, and the other adhering to legal principles. The very basis of plaintiff's suit is the enforcement of its contract and it

seeks a court of equity because of the broader and more satisfactory and adequate relief afforded. In doing so, it must submit to the rules of equity. "It is a general principle that when, from personal incapacity, the nature of the contract, or any other cause, a contract is incapable of being specifically enforced against one party, that party is equally incapable of enforcing it specifically against the other." *Marble Co.* v. *Ripley*, 10 Wall. 359, 19 L. Ed. 962. This is through want of mutuality, which governs relief both in courts of law and equity. For instance, in the present case the payment by the plaintiff of the commutation was for an expired term, and there was no binding, legal obligation on it to pay any further rental, or do or perform anything further under the lease, and the lessor was powerless to enforce specific performance thereof. Hence equity is justified in refusing relief to the plaintiff. At all times it had the lease at its will, without being legally obligated thereby. The lease, if treated as mutually terminable at will, is not unfair, but, if construed according to plaintiff's contention, it is itself the best evidence of its unfairness. Without any present consideration therefor, it seeks to bind the lessor's land for the period of three years. It assures the completion of a well in six months, or in lieu thereof the payment of one dollar per acre per annum until a well is completed, without fixing a certain time of payment, and then provides for surrender at any time, and release of all moneys due. The forfeiture clause is clothed in such ambiguous language that highly eminent counselors and judges learned in the law differ as to its meaning, and yet, "an old, feeble man easily influenced," is expected to fully comprehend it. "Those engaged in the production of oil send agents armed with printed leases to solicit leases, and they take leases for great areas, and they are forms already prepared; and the people in many instances know little of them, are inexperienced in oil operations, and are without legal advice. They rely on the agent." Such leases should be construed most strongly against him who solicited and prepared them. *Bettman* v. *Harness*, 42 W. Va. 448, (26 S. E. 271), 36 L. R. A. 566, cited. Plaintiff insists that this lease should be construed

as a whole, and so as to make it binding on the parties.    It is impossible, against its express provisions, to construe it so as to bind the lessees, who reserved to themselves the right to vacate it at any time.    Yet it might have been construed so as to bind the lessor, had the lessees at the proper time insisted on such construction, and complied therewith.    No time is fixed for the payment of the commutation money, except that it is to be thereafter; that is, after the expiration of the six months allowed for the completion of a well.    It is to be at the rate of one dollar per acre per annum.    The words "per annum" were undoubtedly used to fix the rate, and not the date of payment, and for no other purpose, so that the lessees could have as well claimed that the time of payment was to be at the end of twenty-four as twelve months, after the expiration of the six months, or they might have claimed it to be at the expiration of the lease, except that would give no time for forfeiture.    The plain object of this provision was to secure the completion of a well, or the forfeiture of the lease. In oil leases, generally, this commutation money is required to be paid in advance of the term covered by it, so as to form an executed consideration therefor; and, in case of failure to pay, the lease becomes immediately forfeitable. In this lease it is indefinite, except that it is to be paid in lieu of, and after, the failure to complete the well within six months from its date.    Then, if the well is not so completed or the rentals paid, the lease becomes null and void. A reasonable construction would be that the lessees were to complete a well within six months, and on their failure to do so, or immediately thereafter, the lease was to become null and void, unless they forthwith paid in advance at the rate of one dollar per acre per annum for an extension of the lease until such time as they could reasonably hope to secure the completion of a well, not exceeding the term limit.    This would be carrying out the main purposes of the lease on the part of the lessor, to wit, the production of oil and gas, and would have changed the character of the estate from one at will to one of a fixed term.    And this is the only way to construe this lease so as to render it just and equitable to the lessor.    The lessee having the surrender clause for his release, the only way to bind him

is to require the commutation money for a limited term to be paid in advance, thus furnishing the lessor consideration for his forbearance. Then, if the lessees fail to pay and are insolvent, the lessor can protect himself by forfeiture. But if the commutation is not to be paid until the end of the term, at the pleasure of the lessee, the only protection the lessor can have is to terminate the lease under the surrender clause. Such a construction as this destroys the plaintiff's rights, as it renders the lease forfeitable at the end of six months from its date. And this is the only construction that will make it a binding lease on the plaintiff at that date. In all such cases the commutation money should be payable in advance, unless there is a valuable consideration which will make it nonforfeitable for the term the lease is to run.

The lease from which this one was evidently copied (*Hooks* v. *Frost*, 165 Pa. St. 246, 30 Atl. 846) required such advance payment; but the draftsman of this evidently wanted to place the lessee in condition to surrender the lease at any time without being obliged to pay the commutation money or other rental. It may have been through ignorance. But, ignorance or not, he dug the pit, and his friend fell into it. Many do likewise. He is not the only pebble.

The sixth and final contention of the plaintiff is that the court ignored the plaintiff's claim to the one-eighth of the oil, being the royalty due the lessor, which is a point in argument insisted as fairly arising on the record. This is a point that has not been properly presented to, or decided by, the circuit court, and therefore does not fairly arise upon the record, but is unfairly presented here. The appeal in this case was from the order dissolving the injunction for want of equity. The relief sought is not against the lessor, but his subsequent lessees; and the prayer is not for the oil in kind, but that an account might be taken of the amount and value of the oil, and that the South Penn Oil Company might be required to pay the value thereof to the plaintiff. The ground for jurisdiction in equity was the staying of waste, and the prevention of irreparable injury. In upholding the subsequent leases, the court decided the equities against the plaintiff; and if

it has a claim to the royalties, or the value thereof, the remedy at law is ample. It is only a pecuniary question, which can be compensation in damages, or the royalty can be recovered by appropriate action. Neither the South Penn Oil Company, the pipe-line company to whom the oil is delivered, nor the common lessor, is shown to be insolvent. There are no sufficient allegations touching this royalty alone that will give equitable relief. Not only is this true, but it is also a serious question whether the plaintiff can set up any claim to this royalty under its lease by virtue of its payment of the commutation money. As heretofore shown, this money was paid for an expired term, and not for a future term. Plaintiff's lease does not legally bind it to pay anything for a future term covering the time of the production of this royalty, but it may terminate the lease at any time by surrender, and be released from all moneys due or to become due. Hence it cannot have this royalty, not having paid the consideration therefor, without the assent of the lessor, who has not been properly impleaded in relation thereto. The commutation already paid is for a past term, when neither of the lessees had possession of the land. Its payment is equivalent to sinking a dry hole. *Steelsmith* v. *Gartlan*, 45 W. Va. 27, (29 S. E. 978). The subsequent lessees then entered, and found oil, and began producing the royalty. It does not appear whether the plaintiff paid the annual commutation money, which according to its own contention, would come due on the 11th day of November, 1899, in stead of in advance on the 11th day of November, 1898; and, if it was not so paid, its lease would certainly now be forfeited, and it would have no claim to the royalty.

All these various contentions of the plaintiff for a rehearing are wholly untenable, without legal support, and do not justify a continuance of this litigation. The rehearing should be refused.

*Affirmed.*